E. H. EMERY & COMPANY, Appellee, v. AMERICAN REFRIGERATOR TRANSIT COMPANY et al., Appellants (and six other cases).

**CARRIERS:** Loss or Injury to Goods—Liability of Non-common Carrier to Third Party. A party who is not, in fact, a common carrier, but who expressly or impliedly contracts with a common carrier to perform acts which the common carrier is required to perform for

the proper handling of a shipment, thereby becomes liable to a shipper in damages consequent on the negligent manner in which said acts are performed, even though no contract relations exist between the party so contracting to perform and said shipper.

*Appeal from Wapello District Court.*—C. W. VERMILION, Judge.

SEPTEMBER 26, 1922.

REHEARING DENIED DECEMBER 15, 1922.

ACTION at law to recover damages alleged to have been sustained in the shipment of 25 carloads of peaches. Judgment was entered for the plaintiff and the defendant appeals.—*Affirmed as to certain cases and reversed as to others.*

*Brammer, Lehmann, Seevers & Hurlburt* and *McNett & McNett*, for appellants.

*Chester W. Whitmore*, for appellee.

DE GRAFF, J.—Seven cases of the same nature are involved on this appeal. Plaintiff seeks to recover damages from the American Refrigerator Transit Company for injury sustained to 25 carloads of fresh peaches shipped by the plaintiff during the season of 1912 from Clarksville, Arkansas over the initial line of the St. Louis, Iron Mountain & Southern Railway Company to various destinations in the United States.

In this opinion the defendant will be called the A.R.T. and the railway company—the Iron Mountain.

This case was first instituted September 24, 1915 and entitled *Emery & Co. v. Chicago, B. & Q. R. Co.* See 186 Iowa 1156. The record in that case by stipulation is made a part of the record in this case. The original action resulted in a judgment for the carriers and in a dismissal as to the A.R.T. Co., not on the merits but because of venue. Code Section 3502. New petitions were filed as substitutes for the original petitions in conformity to the order of the trial court. On application the attachment proceedings were removed to the Federal court on the claim that a Federal question was involved. The order of removal was reversed. *Emery & Co. v. American Ref. Tr.*

*Co.*, 246 U. S. 634 (62 L. Ed. 912). Upon remand the case came on for trial October 10, 1919. The jury was waived by consent of the parties and the seven cases were consolidated for the purpose of trial and submitted upon the former evidence taken in the case reported in the 186 Iowa supra. This action sounds in tort and is based on specific acts of negligence.

The alleged damages are predicated upon the negligence of the A.R.T. in the following particulars: (a) Defendant failed to ice the bunkers to capacity the day before loading. (b) Defendant failed to re-ice the cars when loading was by it completed at Clarksville, and negligently permitted the cars of peaches to leave Clarksville without re-icing and with insufficient ice in the bunkers to chill the peaches and preserve them to the next point, or station. (c) Defendant negligently furnished for such traffic, antiquated and obsolete cars with ice bunkers of such small capacity as not to furnish a reasonably sufficient refrigeration capacity to preserve the peaches in transit and not suitable for such traffic. (d) Defendant negligently failed to re-ice the bunkers to capacity every 24 hours or at such times as reasonable care required for the preservation of the peaches and negligently permitted the ice in the bunkers to become exhausted or so low as to be insufficient to afford refrigeration for the fruit in transit.

The plaintiff is a partnership engaged in the wholesale fruit business at Ottumwa, Iowa. The A.R.T. Co. is a corporation engaged in owning and operating refrigeration cars which are transported on various lines of railways throughout the United States.

On January 1, 1894 a contract was entered into between the Iron Mountain and the A.R.T. It is the thought of this contract that the business of transporting perishable freight will be largely increased by the use of the refrigerator cars on the lines of the contracting railway and that greater safety will be secured in the transportation of all kinds of perishable property over the lines of said railway. Mutual benefits were in contemplation. The A.R.T. agreed ''to solicit and develop the perishable freight business'' along the lines of the railroad and ''to provide, for the use of shippers, refrigerator cars in sufficient number to transport all perishable goods'' offered to the

A.R.T. for transportation over the lines of the said railway. The contract specifically enumerated a great number of articles from ale to yeast cakes, and "embraced in fact all goods of every kind whatsoever requiring refrigeration to prevent their being spoiled or damaged by heat, and with needed provisions to prevent their being damaged or destroyed by cold, either through or local, which cars are to be constructed and made as to prevent such goods from being injured, either from heat or cold."

It is further provided that the rules and customs now existing or as amended from time to time among railroad companies as to interchange of cars and repairs thereof should apply to the cars furnished; that in the transportation of perishable goods the cars of the A.R.T. shall be received by the railway company in preference to the cars of any other company or person so far as the right to receive same and to lawfully refuse other cars; that the railway company shall furnish free of cost to the A.R.T. suitable and convenient sidetracks and standing room for the refrigerator cars and shall also furnish such suitable buildings and cold storage rooms in their respective depots or at other places convenient thereto as the business of the A.R.T. may require and that the A.R.T. upon the failure of the railway company to so furnish shall have the right to erect cold storage rooms at its own expense upon the railway property; that the railway company shall at all times give prompt attention and dispatch to the cars and business of the A.R.T.; that at all points where the railway company has ice houses and ice stored the A.R.T. shall without detriment to the railway have the use of the ice so stored and the railway company at the request of the A.R.T. shall sell to it at cost so much of surplus ice as it may from time to time require in its business and the railway company shall transport over its lines all ice and other supplies which the A.R.T. may require at the lowest existing tariff rate and in no event in excess of three quarters cent per ton per mile.

It was further agreed that the railway company should pay the A.R.T. one cent per mile for each and every mile any of its cars may be run over the railway lines and on all freight carried in the cars of the A.R.T. the railway company should pay a commission of 12½ per cent of the freight charges re-

ceived for the transportation over its road after deducting certain specified charges. The railway company also agreed to collect all charges due the A.R.T. and to place on its bills and collect and pay over to the A.R.T. all extra charges that may be due from the shipper for ice or hay or for special lease of cars, "except in case of refusal of consignee to receive the property, in which case, if loss ensues to the parties to this agreement, it shall be borne by them jointly upon the basis of revenue charged," except where the loss is due to the fault of the A.R.T., in which case the entire loss is chargeable to the latter.

The foregoing are the primary conditions of the contract material to the instant appeal.

The A.R.T. is not a common carrier. *Ellis v. Interstate Commerce Com.* 237 U. S. 434 (59 L. Ed. 1036); *Emery & Co. v. American Ref. Tr. Co.* 246 U. S. supra.

Its liability, if any, to the plaintiff must be based upon its failure to perform some duty or obligation not incident or related to it as a common carrier. Several questions are suggested at this point.

May the liability of the A.R.T. as alleged be predicated on a violation of its contract with the railway company or initial carrier? Does it arise from any contract, express or implied, with the plaintiff? Must it be said that its liability, if any, is predicated on a tort—the failure to properly perform some duty owing or assumed by it to plaintiff and constituting negligence? Emery & Company, plaintiff-appellee herein, had no contract of carriage with the A.R.T. or in fact any contract with said company. Plaintiff's contract was with the Iron Mountain whose duty it was under the law to carry safely and with regard to the perishable character of the shipment. *C. C. Taft Co. v. American Exp. Co.* 133 Iowa 522.

We are not dealing with the liability of the railroad company. Clearly the plaintiff would have no recourse against the A.R.T. if the latter had refused to carry out its contract with the carrier. Its liability therefore is only in those respects in which it undertook to perform and negligently performed.

The conditions of the ice bunkers in the refrigeration cars at Clarksville, Poplar Bluff, or at any other point on the line is not material unless the A.R.T. Co. undertook to do the icing and

its negligence is the proximate cause of the damage alleged. The contract of the A.R.T. with the Iron Mountain did not expressly impose upon it the duty of icing or loading. Nor is it material in the consideration of this appeal to determine whether the cars in question were furnished in a strict or literal sense to the shipper by the A.R.T. or by the railway company. The plaintiff shipper did deal directly with the railway company and the latter furnished the cars in response to his orders. The perishable goods in this case were not offered to the A.R.T. for transportation and there was no privity of contract between the shipper and the A.R.T.

It may be conceded that when the Iron Mountain received a car at any point on its line it directed the movement of that car and sent it where it pleased. It furnished it to any shipper it chose and permitted its loading with any commodity it saw fit. The A.R.T. had no control in this matter. The legal obligation of the A.R.T. to furnish cars arose by virtue of its contract with the railway and when it furnished cars, if accepted, its obligation ended.

The A.R.T. was not in the joint management of the railway company. Its liability, if any, must be predicated upon its own tortious acts. What if anything did the A.R.T. undertake to do relative to the shipments in question? The evidence is sufficient to warrant the trial court in making its finding that the meat cars which were tendered to the shipper and which were used by him had too small icing capacity and improper ventilation for the proper and successful transportation of peaches over long distances. This, however, in itself did not impose a liability upon the A.R.T. by virtue of its contract with the railway company. The evidence shows however, that the A.R.T. had a representative present at the loading point and that he directed, assisted, suggested and supervised the loading and the icing of the cars in question.

Referring to this agent one witness testified: "He went with me to look at the decking and bracing of these cars and I asked him down there and he went with me to see how much ice there was in those cars at times."

Another witness testified: "The A.R.T. Co. had a man in there who instructed us how to load and brace the car." Again,

"I would report to the A.R.T. man and he would say they would be iced at Russellville if going east and at Van Buren if going west."

Plaintiff's contract with the Orchard Company provided that the company should load for him. The tariff provided that the shipper should load.

It is also shown that the A.R.T. paid the Orchard Company $8.00 per car for loading, stowing and bracing the peaches in the cars. The A.R.T. had notice of the use of these meat cars and had knowledge of the suitability or lack thereof of said cars for the shipment of peaches. It knew these cars when furnished were to be used for the shipment of peaches, and it did undertake pursuant to the terms of its contract with the railway, to assist and supervise said shipments.

We deem it unnecessary to analyze the evidence in detail in this particular. The findings of the court have the effect of the verdict of a jury. Sufficient to state that the evidence with the reasonable inferences to be drawn therefrom sustain the finding as to negligence in this particular.

We now pass to the question of icing which is one of the primary causes of damages as alleged. First, it may be stated that the carrier under its tariff was obligated to pay to the A.R.T. the entire refrigeration revenue. The record does not establish by direct testimony that the A.R.T. iced the cars in question, but this is not necessary for a recovery. Circumstantial evidence with the inferences that may be drawn is sufficient to prove this controverted fact. The trial court ruled the evidence to be sufficient.

It is clear that the contract between the A.R.T. and the Iron Mountain contemplated the handling of the business giving rise to the instant suits. It contemplated that the cars furnished were to be constructed and made "as to prevent such goods from being injured either from heat or cold." True this contract did not provide for the icing of any car at any specific point nor would the contract impose a liability upon the A.R.T. to the plaintiff unless it is shown that it undertook to do, either directly or indirectly, the obligation of icing or of superintendence in such matters.

The obligation to ice is primarily on the carrier, but if the

A.R.T. assumed the responsibility under its contract with the carrier and did undertake to do, direct, or supervise the icing then its negligence, if any, makes it liable.   The A.R.T. by its answer to an interrogatory attached to the pleadings stated: "This defendant was paid by said railway company whatever was due it on account of services rendered and ice furnished by this defendant in connection with the transportation of said shipments, including the cost of ice used for the purpose of protecting said shipments while upon the lines of carriers other than those parties to the above mentioned contract, which ice was paid for by this defendant, although not furnished nor placed in said car by it."

It is not necessary in this case to hold that the Iron Mountain surrendered any of its functions as a railroad nor are we concerned with its liability in the premises.   It is a question involving the undertakings of the A. R. T. in the matters alleged and whether or not the damages proximately resulted through negligence on its part.   The defendant was not liable as the agent of the railroad unless it undertook to perform certain of the things required of the carrier under the latter's contract of shipment with the plaintiff.   However, if the A.R.T. was in fact the agent of the railroad in the performance of the acts upon which the negligence is predicated, then under the weight of modern authority such acts, if amounting to misfeasance, creates a liability.   *Emery & Co. v. American Ref. Tr. Co.* 193 Iowa 93.

We are satisfied that the evidence shows such a relationship. In a letter bearing date of October 14, 1912 written by the general agent of the A.R.T. in answer to a complaint of the plaintiff relative to the damages involved herein it is said: "I am indeed surprised to note that you state that you will file claims for every A.R.L., S.R.L., and N.C.L. car used in the movement of your peaches, for the reason that we placed every precaution necessary in connection with the proper icing of peach shipments in this class of equipment, and my investigation shows that on account of the fine carrying quality of both the Texas and Arkansas peaches and on account of the cars' being well iced in transit, shipments according to reports that I have received arrived at destination in good condition."

A tariff provision reads: "Prompt notice must be given by wire to the superintendent of the American Refrigerator Transit Co. St. Louis, Mo. of all diversions requested in order that prompt refrigeration or ventilation may be provided for." It is also admitted by the A.R.T. in answer to a certain interrogatory that under the contract with the Iron Mountain the railway company paid whatever was due to it on account of service rendered and ice furnished by this defendant in connection with the transportation of said shipment, "including the cost of ice used for the purpose of protecting said shipment while upon the lines of carrier other than those parties to the above mentioned contract, which ice was paid for by this defendant, although not furnished nor placed in said car by it."

On one of the shipments as shown by the expense bill as to charges advanced by the consignee to the B.&.O. Railroad Company, a destination carrier at Columbus, Ohio, for receiving, weighing, storage, transportation, delivery, etc. it is recited: "Agent at Dest keep a clear record of the time of arrival Amt of ice in bunkers, Temp of car, cond. of fruit Deld & Re-icing mailing your report to W. Haley Supt of A.R.T. Co. St. Louis, Mo."

This bill is stamped paid by the agent of the B.&.O. Railway and also stamped: "A.R.T. Co. 32197."

The trial court upon all the evidence determined that it was the intention of the parties that the A.R.T. should be responsible for the icing and in fact did ice. Under the evidence and the inferences to be drawn therefrom this finding has support and we do not feel warranted in disturbing such finding.

It may be stated also that the claims for damages herein were in the hands of the A.R.T. for adjustment for a long time although the general agent of the A.R.T. did suggest in a letter to the plaintiff that the claims should be filed with the initial carrier yet it did not promptly disclaim its liability. Upon request of the plaintiff it did attempt to effect a settlement with the railroad.

We do not emphasize these facts for the purpose of fixing liability but a court may properly consider the relations of the parties and the claims made by the parties under such circumstances. A court must look not only to the contract but also to

the manner and the method of conducting the business as well as to the conduct of the defendant in its undertaking in the matters upon which negligence is predicated. If the most essential duty in the premises was attempted to be performed by the A.R.T. then it is proper to base the damages upon the negligence, if any, in the performance of such duties.

The trial court determined the relation of the parties having in mind the contract between the railway company and the A.R.T. and expressed its conclusion under the facts in this language: ''While plaintiff would have no recourse against the refrigerator company if the latter had refused to carry out its contract with the carrier, yet when it entered upon the performance of the work it undertook, as an agent of the carrier to do, it was under a duty to plaintiff to use reasonable care in the manner of its execution and so as not to cause injury to the plaintiff as the natural consequence of its acts.''

As heretofore indicated no purpose will be served in reviewing the evidence set out in a voluminous abstract. We are primarily concerned with the legal principle involved. The question involved is an old one concerning which there is much conflict of authority. The difficulty lies in determining whether the agent owes a duty to a third person. Liability is predicated on duty. If the agent is put in control of the situation with the express or implied consent of the principal or is given or exercises such powers within his authority that an independent actor would have, it is quite generally held that he owes a duty to third persons to use due care in what he does, the same as any other individual. Such a control of property imposes upon him a duty, not altogether and simply as agent, but as a custodian and controller of such property for the purposes in hand. The fact that he also owes a special duty to his principal is not material.

It may be conceded he owes such a duty and his failure to perform properly may be considered as nonfeasance to his principal, but it is misfeasance to a third person injured thereby. Briefly stated the negligence of the agent converts what otherwise would have been a proper performance of his duties into misfeasance.

We will not trace the history of this doctrine and the vary-

ing shades as expressed in judicial opinions.  See *Bell v. Josselyn* 3 Gray (Mass.) 309; *Lottman v. Barnett*, 62 Mo. 159; *Ellis v. McNaughton*, 76 Mich. 237; *Greenberg v. Whitcomb Lbr. Co.* 90 Wis. 225; *Lough v. John Davis & Co.* 30 Wash. 204; *Haynes' Admrs. v. Cincinnati, N. O. & T. P. R. Co.* 145 Ky. 209; *Schlosser v. Great Northern R. Co.* 20 N. D. 406; *Jackson v. Orth Lumber Co.* 121 Minn. 461; *Rising v. Ferris* 216 Ill. App. 252, *Mayer v. Thompson-Hutchison Bldg. Co.* 104 Ala. 611; *Campbell v. Portland Sugar Co.* 62 Me. 552.

Certain matters incidental to this case have been presented in brief and argument but they are in no wise controlling on the issues presented.  Special complaint is made that in certain instances the court erred in the amount of damages awarded as to certain cars involved in the shipments.  This point is in part well taken and we will briefly note the complaint.

In Case 10242 Count VI involving Car A.R.L. 5303 judgment was entered for $100.  The petition alleges a market value of $1.50 per bushel.  The peaches were sold for $1.50 per bushel and therefore under the rule of damage plaintiff suffered no loss.  As to this count the judgment is reversed.

In Case 10242 Count V involving Car S.L.S.W. 50318 there is an error in computation in the amount of damage in the sum of $109.75 and the judgment must be reduced in this amount or a reversal ordered.

In Case 10245 involving Car S.R.L. 3186 the peaches were consigned to Omaha.  The car contained 397 bushels of peaches and were sold to the consignee F.O.B. Clarksville for 55 cents a bushel or a total of $218.35.  Upon arrival of the car the consignee refused to accept the peaches and thereafter the peaches were sold to the consignee at 70 cents a bushel.  The peaches were held from July 31st until August 3d, when they were sold by the terminal carrier to the consignee.  The evidence shows that the damage to the peaches in this car was primarily due to rough handling in transit.  The cause of the damage as disclosed by the evidence is not chargeable to the A.R.T.  The judgment entered as to this count in the sum of $100 is error, and is reversed.

In Case 10242 Count IV involving Car S.R.L. 3308 it is shown that the car contained 391 bushels of peaches and that the

market value on arrival in New York was $1.50 per bushel. This car was refused by the consignee. Judgment was entered on this basis without taking into consideration the freight charges or other expense. We are not advised what the terminal carrier did in the premises but we are not justified in holding that the carrier is guilty of a technical conversion in the absence of proof. *Martin Woods Co. v. Chicago, R. I. & P. R. Co.* 161 Iowa 639. The evidence does show, however, that this car was condemned by the city board of health "as unfit for human consumption," and therefore the property may be considered as totally destroyed. *Clark v. American Exp. Co.* 130 Iowa 254. The measure of damage under such circumstance is the full value of the goods at destination. If the freight charges have not been paid the shipper is still liable therefor, but there is no showing that the freight has not been paid. Under the record we determine that the court was not in error in entering the judgment on this count.

In Case 10243 Count VI involving Car N.C.L. 9917 a somewhat similar situation arises. This car had some value as the terminal railroad sold the peaches. The shipper did not receive any part of the proceeds. It is not shown that the proceeds were not applied to the payment of the freight. It will be observed that the A.R.T. is not entitled to the freight charges, and the carrier is not defendant herein. The A.R.T. is not a party to the tariff or B-L. In the light of the record we do not consider the point well taken.

Appellee has also moved the court for the imposition of the statutory penalty on the theory that the present appeal involves no new question and that the decision of this court in the 193 Iowa 93 controls the law of this case. The motion is overruled, and except as to the judgments entered as to certain counts heretofore recited the judgments entered by the trial court are— *Affirmed.*

STEVENS, C. J., WEAVER and PRESTON, JJ., concur.