LAWRENCE WAREHOUSE CO. v. DE-FENSE SUPPLIES CORPORATION.

CAPITOL CHEVROLET CO. v. SAME.

McGREW v. SAME.

DEFENSE SUPPLIES CORPORATION v. HENRY.

No. 11418.

Circuit Court of Appeals, Ninth Circuit.

Dec. 5, 1947.

Rehearing Denied Jan. 2, 1948.

774

W. R. Wallace, Jr., W. R. Ray, and Williamson & Wallace, all of San Francisco, Cal., for appellant Lawrence Warehouse Co.

Morris Lavine, of Los Angeles, Cal., for appellant Capitol Chevrolet Co.

Albert H. Gommo, Jr., of San Francisco, Cal., for appellant McGrew.

Theodore R. Meyer, Brobeck, Phleger & Harrison, and David E. Lombardi, all of San Francisco, Cal., for appellant Defense Supplies Corporation.

Louis J. Glicksberg, of San Francisco, Cal., for appellee Clyde W. Henry.

Before DENMAN, HEALY, and BONE, Circuit Judges.

HEALY, Circuit Judge.

Defense Supplies Corporation, an agency of the United States, recovered a judgment in damages against Lawrence Warehouse Company, Capitol Chevrolet Company, and B. J. McGrew, for the negligent destruction by fire of a quantity of automobile tires and tubes stored in a warehouse. With the exception of McGrew, the named defendants have appealed from the judgment. The defendant Clyde W. Henry, owner of the building in which the property was stored, was exonerated from liability, and from this phase of the judgment Defense Supplies Corporation appeals. In the interest of brevity Defense Supplies will be referred to as the Corporation, the Lawrence Warehouse Company as Lawrence, and the Capitol Chevrolet Company as Capitol.

The purpose of the Corporation was to create a stockpile of used and spare automobile tires and tubes in aid of the national defense. A quantity of these commodities having early in 1943 been accumulated at Sacramento, the Corporation contracted with Lawrence for their safekeeping and storage. Lawrence had earlier entered into an agency agreement with Capitol for the storage of tires and tubes to be delivered by Lawrence as custodian for the Corporation. In pursuance of this agreement Capitol, on March 1, 1943, leased from Henry a building known as the Ice Palace, formerly a skating rink, located outside the city of Sacramento. This was a wooden structure having connected with it an engine room, also of wood save that the partition between it and the main body of the Ice Palace was of concrete. The Corporation approved the lease of the Ice Palace as a place of storage, and gave its approval also to the agency contract between Capitol and Lawrence. Upon the lease of the building the accumulated tires were stored there. On April 9, 1943 the structure, together with its contents, was destroyed by a fire originating in the engine room.

By the terms of the contract between the Corporation and Lawrence the responsibility of the latter for the care and protection of the tires was confined to such care as is required by laws governing warehouses in California [see Warehouse Receipts Act § 21, 3 Deering's Cal.Gen.Laws, Act 9059] and to the exercise of ordinary care on the part of the warehouseman. The agency agreement between Lawrence and Capitol obliged the latter "to store and safeguard the storage" of such tires and tubes as were received by it from Lawrence as custodian for the Corporation. In the trial court's opinion (D.C., 67 F.Supp. 16) the question posed for determination was whether, from a preponderance of the evidence, it had been made to appear that the bailees failed to take reasonable precautions for the prevention of fire and for its extinguishment after it occurred, thereby causing or contributing to the loss. The evidence was thought to justify an affirmative answer to this inquiry. The findings were that Lawrence and Capitol failed to exercise reasonable care for the safeguarding from fire of the goods stored with them, and that by reason of such want of care the goods were destroyed. The negligence of these parties was found to be concurrent with that of the defendant McGrew.

■ 1. Lawrence and Capitol insist that the evidence is insufficient, as a matter of law, to support the findings. We are unable to agree. To begin with, we are obliged to accept as true the finding that the fire originated from the use by McGrew of an acetylene torch in the cutting up of a steel tank in the engine room. The sufficiency of the showing to this effect is hardly open to debate. McGrew was a driller of wells. He needed steel casing for the lining of a well which he had undertaken to drill for Henry, and he obtained Henry's permission to use the steel to be had from the tank. Four days preceding the fire McGrew went to the Ice Palace with Henry's employee who bore a card from Henry, addressed to the watchman, asking that the men be allowed to enter "to remove pipe & equipment." The guard on duty declined to give the permission in the absence of directions from Capitol. The authority requested was then obtained by McGrew from the assistant manager of Capitol who instructed the guard accordingly.

On the day previous to the fire McGrew came to the Ice Palace with his equipment, including the acetylene torch, and proceed-

ed by means of the torch to cut up the steel tank in the engine room. The windows of this room and the door from the outside appear to have been open at least a portion of the time while the work was in progress. Next morning the cutting task was resumed, and shortly after twelve noon the fire broke out at or near the spot where the torch was in operation. There was evidence of the presence of some dark substance on the floor at the corner of the tank. While several hydrants were outside, there was no fire fighting equipment in the engine room other than a five-gallon bucket of water McGrew had placed there. McGrew threw this water and several additional bucketsful on the fire but his efforts to halt the flames were ineffectual, and the conflagration spread rapidly to the main part of the building where the tires were stored.

When Capitol was approached by McGrew for leave "to remove pipe & equipment" it did not inquire as to the mode of procedure to be followed in the performance of the work, nor did it take any steps to ascertain what McGrew was actually doing after his entry. No precautions were taken in the way of providing fire fighting equipment with which such a fire as the torch started could have been put out. This, too, in a structure in which valuable and highly inflammable material was stored for safekeeping.

■ In the face of this showing neither Lawrence nor Capitol came forward with evidence tending to establish due care on its part. Both contend that the Corpora- tion's burden of proving negligence was not discharged by the showing, but the local authorities indicate a contrary view. In line with general authority on the subject, it is held not necessary that there be direct evidence of negligence as a fact; proof of circumstances from which it may rationally be inferred is enough. Wilson v. Southern Pacific R. R. Co., 62 Cal. 164, 172. And when such circumstances have been disclosed it devolves upon the warehouseman to show, as a matter of defense, what would constitute ordinary care on his part in the operation and management of his warehouse. Runkle v. Southern Pacific Milling Co., 184 Cal. 714, 195 P. 398, 16 A.L.R. 275.[1]

■ Now if Capitol was negligent in safeguarding the goods it follows as a matter of course that its dereliction is imputable to its principal, Lawrence. The latter argues that Capitol's negligence, if any, was not shown to be within the scope of its authority as an agent, and that there was no finding that it was. While the findings are not specific in this respect, the trial court's opinion shows that the decision as against Lawrence was grounded on imputed negligence. The facts of the case and the terms of the agency agreement fully support that conclusion.[2]

■ Capitol or Lawrence, in certain instances both, attempt to disclaim responsibility on the basis of circumstances said to be peculiar to this case. We turn now to special circumstances. One of them relates to the fact that the Corporation approved the selection of the Ice Palace as a place of

---

[1] Cf. for other cases bearing on the point, Lake Union Dry Dock & Machine Works v. United States, 9 Cir., 79 F. 2d 802; Wilson v. Crown Transfer & Storage Co., 201 Cal. 701, 258 P. 596; Atwood v. Southern Cal. Ice. Co., 63 Cal.App. 343, 218 P. 283; Travelers Fire Ins. Co. v. Brock & Co., 30 Cal.App.2d 112, 85 P.2d 905; U Drive & Tour v. System Auto Parks, 28 Cal.App.Supp.2d 782, 71 P.2d 354; England v. Lyon Fireproof Storage Co., 94 Cal.App. 562, 271 P. 532; 8 C.J.S., Bailments, § 50.

[2] There is some argument in Capitol's brief to the effect that, as an agent, it is not liable to a third party for a violation of its duty to its principal. We think that since Capitol undertook to store and safeguard the storage of the tires it is not in position to disclaim liability on the ground that it acted only as an agent. The general rule is (and no California authorities holding the contrary are cited) that if an agent, acting in the course of his principal's business, negligently causes immediate injury to the property of a third person, whether or not he be one to whom the principal owes a special duty, under circumstances which would impose liability on the agent if he were acting under the same conditions on his own account, he will be personally liable. 1 Mechem on Agency (2d) § 1460; 3 C.J.S., Agency, § 221; 2 Restatement of the Law of Agency § 354; E. N. Emery & Co. v. American Refrigerator Transit Co., 194 Iowa 926, 189 N.W. 824; Giles v. Moundridge Milling Co., 351 Mo. 568, 173 S.W.2d 745.

storage. We may assume that the approval would relieve the warehousemen had some known defect in the premises been the cause of the loss. But such is not thought to be the situation here. The loss resulted from the use of the acetylene torch; and the record is devoid of intimation that the Corporation approved its use, or had knowledge of the failure of the warehousemen to take reasonable precautions to safeguard the property from hazards that might naturally be expected to flow from the use of such an instrumentality.

Another circumstance relates to the status of Kissell, the guard on duty while McGrew was at work. This man was an employee of the Burns Detective Agency. In the course of the trial it was stipulated that the Corporation requested the establishment of a twenty-four hour guard service; that in compliance with the request Lawrence, with the Corporation's assent, employed the Burns Detective Agency, and paid them; and that the Corporation reimbursed Lawrence. On the strength of this arrangement Capitol appears to argue that the premises were not in its custody but were in the joint custodianship of Lawrence and the Corporation. It attempts to saddle the responsibility elsewhere on the further ground that Kissell, who was not its employee, saw McGrew working with the torch and did nothing about it. There are several answers to this line of argument. To begin with, the disclaimer of custodianship is at loggerheads with Capitol's conduct and with the terms of its written contract with Lawrence. Again, the stipulated facts are insufficient to support an inference that the Burns Agency or the guard was an employee of the Corporation. Moreover, it was Capitol, not the guard, who permitted McGrew to enter and pursue his work in the building. Kissell's presence did not preclude vigilance on Capitol's part or, indeed, render its exercise any the less imperative since Kissell acted in the matter under Capitol's directions and had no apparent reason to suppose that McGrew's use of the torch was unauthorized.

A third circumstance has to do with a provision of the lease between Capitol and Henry to the effect that "Lessor shall have the right at all times during the term of this lease to enter said leased premises for the purpose of examining or inspecting the same, and of making such repairs or alterations therein or in other parts of said building as said Lessor shall deem necessary in connection with said premises, or said building." This provision, it is claimed, gave Henry or his representatives the right to make "alterations" of the kind McGrew was making; and since the Corporation approved the lease it is in no position to complain of what was done. We think, however, that the cutting up of a boiler for the purpose of fabricating well casing was not such an alteration of the building as the lease contemplated. Even if it were thought to be so, the fact did not relieve Capitol of its duty to take reasonable precautions in respect of the means by which the work was performed. Keeping in mind the structure of the Ice Palace and the inflammable nature of the goods stored there, the use of an acetylene torch on the premises was hardly indicated as a safe method of effecting the alterations. Certainly, if its employment were permitted, reasonable precautions against the hazard of its use were in order. The rule is that precautions are to be taken in proportion to the imminence of probability of harm. Wilson v. Southern Pacific R. R. Co., supra.

The Corporation furnished to Lawrence and Capitol a list of named persons whom it authorized to be admitted to the premises. Though some point is sought to be made of this circumstance, we fail to see significance in it. Capitol and its employees were not excluded, and there is no evidence that the actual custodianship of either bailee was in any way interfered with.

2. Capitol asserts error in the admission or exclusion of evidence relative to the number and value of the tires and tubes destroyed, and claims there was no competent evidence to support the findings in this respect. The proof on the subject was supplied by the testimony of one McClellan, a representative of the Corporation, and by data contained in certain exhibits, one of which was a detailed report by Capitol of the number of tires and tubes lost in the fire.

McClellan's testimony is said to be hearsay, but the record fails to show that any objection to it was interposed on that ground. Concerning quantities the evidence appears to be ample. As to the worth of the property, the opinion of the trial court discloses the method followed in arriving at values. The lowest OPA prices were taken as a guide, and we think no injustice was done the warehouseman by this course. Much is attempted to be made of the limitation upon the free sale of tires and tubes existing at the time, it being argued that the sales by the original owners were coerced by the government at a price fixed by it, hence evidence of the prices paid was inadmissible. The limitation, however, operated to the obvious advantage of the defendants since in a free market the sales value of the goods would doubtless have been much greater.

Such uncertainties as existed were a consequence of the destruction of the property through the warehouseman's fault. Uncertainties of this nature are not a barrier to the assessment of damages. The proof was as good as any available. In the circumstances, as the trial judge observed, the most reasonable basis within the boundaries of possibility should be formulated. Pacific Steam Whaling Co. v. Alaska Packers' Association, 138 Cal. 632, 72 P. 161; Hanlon Drydock & Shipbuilding Co. v. Southern Pac. Co., 92 Cal.App. 230, 235, 268 P. 385; Story Parchment Co. v. Paterson, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Rilovich v. Raymond, 20 Cal.App.2d 630, 67 P.2d 1062. In this phase of the trial there was no reversible error.

3. On its appeal the Corporation complains of the finding exonerating Henry from liability. The court found that McGrew's relationship with Henry was that of an independent contractor, and there is evidence to support that view of the relationship. The proof bearing upon Henry's knowledge of what McGrew was doing or proposed to do at the Ice Palace is in an unsatisfactory condition or is, at best, in conflict. We are unable to find error in the refusal to hold this defendant.

Affirmed.