**GAIENNIE v. CO-OPERATIVE PRODUCE CO., Inc., et al.**

**No. 2117.**

Court of Appeal of Louisiana. First Circuit.

Jan. 14, 1941.

St. Clair Adams & Son, of New Orleans, and Albritton & Ware and Sanders & Miller, all of Baton Rouge, for appellants.

Fred G. Benton, of Baton Rouge, and Gist & Thornton, of Alexandria, for appellee.

LeBLANC, Judge.

This is a suit for damages for personal injuries and for medical and other expenses in connection therewith, arising out of an accident which took place on the night of October 4, 1937, on Highway No. 71, at a point about ten miles west of Port Allen in the Parish of West Baton Rouge, in which an automobile being driven by the plaintiff, Charles S. Gaiennie and a truck belonging to the defendant, Co-Operative Produce Company, Inc., and being driven at the time by one of its employees, Frank Monte, were involved. The suit is directed against the Co-Operative Produce Co., Inc., and its public liability insurance carrier, Massachusetts Bonding and Insurance Company, to the extent of its liability under the policy of insurance which it carried.

After it had been argued and submitted to this court and we had made a finding of fact on which we readily reached the conclusion that the driver of the truck of the defendant Co-Operative Produce Company, Inc., was guilty of gross negligence, but were left with serious doubt, in view of the apparent conflict in some of the decisions of the various Courts of Appeal of this State, on the question of contributory negligence as pleaded against the plaintiff, we took the liberty of certifying the case to the Supreme Court of the State, under the provisions of Article VII, Section 25 of the Constitution. After due consideration, the Supreme Court answered the questions propounded by us handing down a written opinion which has now become final. 199 So. 377. After stating the case in much the same manner as just outlined, the opinion continues as follows:

"The Court of Appeal states that it has no difficulty in reaching the conclusion that the driver of the truck of the defendant company was guilty of gross negligence, but entertains doubt, under the facts and circumstances, whether or not the plaintiff was guilty of such contributory negligence as to bar his recovery. The Court of Appeal desires answers to the following two questions: (1) What is the general rule that should be applied under the following and a similar state of facts; (2) Under the facts herein outlined, was the plaintiff guilty of such contributory negligence as to bar his recovery? The Court of Appeal in certifying the questions has given its examination of and conclusions upon the matters submitted. After examining the discussion of the case by

the Court of Appeal, it is apparent that court is of the opinion that the judgment of the lower court should be affirmed.

"The statement of facts, as found by the Court of Appeal, is as follows: On the evening of Monday, October 4, 1937, between 8 and 8:30 o'clock, Frank Monte, employed by the Cooperative Produce Co., Inc., and driver of one of its trucks, was returning to Baton Rouge on Highway No. 71 after a day's work which took him to Opelousas and other points as far north as Marksville, Louisiana. The truck he was driving that day was not the one he drove regularly but one which his employer used locally in Baton Rouge. It was a Chevrolet truck, 1937 Model, having a stake body painted blue. He had a regular helper to go on his delivery trips with him, but on that day this helper did not show up so he took a negro boy with him as his helper. This boy has since died and his version of what happened on the night of the accident has never been given.

"Highway No. 71 in this section of West Baton Rouge Parish is straight for a distance of several miles. On reaching a point approximately ten miles west of Port Allen, the truck which Monte was driving ran out of gasoline and it was necessary for him to stop. The entire width of the highway at that point is approximately 52 feet, measured as follows: 20 feet of paved slab, 26 feet of shoulder on the north side, and 6 feet of shoulder on the south side. As Monte was traveling east, the south was to his right and the north to his left. He made no attempt to park the truck on the wider shoulder on the north because of traffic moving on the highway at that moment. He did park on the south side, but did not clear the paved portion of the highway, one of the front wheels of the truck resting on the right shoulder and the other on the paved portion of the road, and both rear wheels resting on the pavement. The body of the truck extended at an angle across the paved slab of the right traffic lane for some five feet from the south edge thereof.

"There is some doubt arising out of the testimony that Monte left the headlights of the truck on after stopping, but assuming that they were burning, they naturally projected a beam of light directly in front of the truck in the manner in which it was parked and afforded no warning of its presence on the highway to traffic that was approaching it from the rear. The preponderance of the testimony shows that the tail and side clearance lights were not burning, and admittedly, there were no flares placed on the highway and no flares were even in the truck. Monte sent the helper to the nearest filling station for gasoline and he remained with the truck. Monte had a flash or searchlight with him but did not use it in trying to warn approaching traffic. Therefore, to traffic coming from the west, this truck, parked on a portion of the paved slab of the highway in the dark, was an object of peril placed and permitted to remain there through the negligence of Monte, who, it is admitted, was acting within the scope of his employment.

"Within a period of time which is not fixed, but which we estimate to be several minutes, during which Monte, the driver of this truck, occupied himself in a rather indefinite manner, as far as his testimony shows, in looking for flares in the truck, Charles S. Gaiennie, the plaintiff herein, approached the truck from the west in a Chevrolet coach belonging to his employer and which he was driving at a rate of speed estimated to be from 35 to 40 miles per hour. He kept his car in the south lane of travel on the paved portion of the highway which was to his right, and as he neared the point where the truck was parked he began meeting cars going west or in the opposite direction to that in which he was travelling. There were four or five cars following each other and all of them with the headlights burning so brightly as to dazzle his eyesight intermittently. He dimmed the headlights on his car and slowed down its speed to between 20 and 25 miles per hour.

"The effect of the dazzling lights from the cars he was meeting was that he was not blinded by them but his vision was momentarily and intermittently impaired to the extent that instead of having a full view of the paved highway ahead of him as he had without such impairment, his view of the pavement was limited to approximately 18 or 20 ft. within which distance he could, at the speed he was going, bring his car to a stop. As he had dimmed the headlights on his car, that had the effect of tilting the beam of light downward at an acute angle on the pavement in front of him, this also causing some restriction in his sight of the pavement as far as distance was concerned.

"Plaintiff felt safe in proceeding on the highway under the circumstances, and he did. As he passed the last of the series of cars whose dazzling headlights caused momentary impairment to his ordinary vision, his car, in the meantime covering such distance as its speed carried it, he found himself confronted with the truck parked on the highway without any sign or warning of its presence, some eight or ten feet ahead of him. The rear body of the truck was some 3 or 4 feet above the ground and extended back some four feet over the rear wheels, so that when plaintiff dimmed his lights the tilted beam of his headlights projected under the truck making it that much more difficult for him to see it.

"As the truck loomed in front of him he made an effort to avoid running into it by applying his brakes and pulling his car to the left in order to pass around it. He was too close then, however, to avert a collision. The right front end of his car struck the rear left end of the truck and because the body of the truck stood lower from the level of the pavement than the radiator and hood of the car by some two to four inches, the front end of the car was pushed under the truck and the upper parts of the car which are made of lighter material such as the radiator, the hood and cowl were badly crushed. The bumper which is made of stronger steel was bent in a sort of "U" shape and the frame to which the motor and body are attached was slightly bent out of line on one end. There is some doubt whether the motor was pushed back but it is shown that the cowl and instrument board in front of the driver's seat were smashed and driven in. The damage to the truck apparently was negligible. It is doubtful whether the impact caused it to be moved forward any distance at all.

"The accident involved herein occurred during the year 1937, prior to the enactment of Act No. 286 of 1938. The law applicable to determine whether or not the plaintiff was guilty of negligence would be Act No. 21 of 1932, Section 3, Rule 4, paragraph (a), which makes it unlawful for any person to drive a motor vehicle upon the roads and highways of this State at any other than a careful, prudent, reasonable and proper speed, having due regard to the traffic, surface and width of the highway, the location and neighborhood, and any other conditions or circumstances then existing. The burden of proof is on the defendant to show that the plaintiff was negligent and that his negligence contributed to his injury. Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 11 S.Ct. 653, 35 L.Ed. 270; Washington & Georgetown R. Co. v. Harmon's Adm'r [Washington & G. R. Co. v. Tobriner], 147 U.S. 571, 13 S.Ct. 557, 37 L. Ed. 284. This doctrine was approved in Loprestie v. Roy Motors, Inc., et al., 191 La. 239, 185 So. 11.

"In the case of Woodley & Collins v. Schusters' Wholesale Produce Co., Inc., 170 La. 527, 128 So. 469, in discussing whether or not the driver of an automobile should be deemed negligent for failing to slow down, we stated that it depended on the circumstances of the particular case, and that it is not easy, nor safe, to lay down a hard and fast rule on the subject. The difficulty in laying down a hard and fast rule is that the act provides that the conditions and circumstances must be considered as well as the traffic, surface and width of the highway, and the location of the neighborhood. Such being the case, the particular facts of each case must be considered in arriving at a conclusion, and it would not be safe to lay down a hard and fast rule for that reason.

"In the case of Louisiana Power & Light Co. v. Saia et al., La.App., 173 So. 537, the court stated in effect that a great many cases have held that the failure of the driver of a moving vehicle to observe an obstruction—usually in the form of a stationary vehicle—constituted such negligence as would prevent recovery, and cited many cases to that effect; but, the court aptly said in effect that this result had not been reached regardless of surrounding circumstances and facts. In fact, the courts have been careful to say in each case that no circumstances were involved that would justify the failure of the driver to see the object ahead. It would appear that this is a reasonable interpretation of the provision of Act No. 21 of 1932, aforementioned, because it specifically provides that the conditions and circumstances must be considered. While the general rule makes it the duty of the driver of an automobile to maintain a speed sufficiently slow and to have such control of his car that he can stop within the distance in which he can plainly see an obstruction or danger ahead, yet it has been well recognized that this rule has

exceptions and modifications. Jacobs v. Jacobs, 141 La. 272, 74 So. 992, L.R.A.1917 F, 253.

"In Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1, this court stated that the general rule is not inflexible, and that its application depends on the facts and circumstances of each case. Many cases were cited therein where the rule was relaxed and the driver of the automobile exonerated from negligence.

"Many cases have held to the effect that ordinarily a motorist is negligent in not slowing down to a speed at which he can stop instantly when blinded by headlights. However, a careful examination will reveal that the circumstances and facts of each case were taken into consideration in arriving at a conclusion. Also, it has been held in many cases that a motorist was guilty of negligence because he failed to see the obstruction or object in time to stop before colliding with it; but, the facts and circumstances of each case have been considered in determining whether or not the motorist had sufficient reasons for not seeing the object or obstruction in time to stop.

"In the case of Moncrief v. Ober, 3 La. App. 660, it was held that a small cable stretched above the surface of a public road was such an unusual obstruction that the failure of a motorist to detect it did not indicate negligence on his part.

"In the case of Kirk v. United Gas Public Service Co., supra, wherein a motorist saw an object ahead of him in the road which he thought was a shadow or repaired patch in the road and did not observe that it was a dead yearling until a moment before it was struck, when it was too late to stop, we arrived at the conclusion that it would be unreasonable to hold the motorist negligent in failing to see the yearling sooner than he did.

"From the facts certified it appears that the plaintiff was driving at a moderate rate of speed, between 40 or 45 miles an hour, on an open highway, with his car properly lighted, and that he slowed down to between 20 and 25 miles an hour on meeting the approaching cars. There is nothing to indicate that the neighborhood within the vicinity was thickly populated. There is nothing in the facts to indicate that the location was such that the plaintiff would expect cars to be parked on the highway, as would be expected where the location were thickly populated. It appears that the plaintiff was travelling at such a speed, after he slowed down, to enable him to meet an ordinary emergency under the circumstances. If the truck had been parked entirely on the pavement the plaintiff could more easily have seen the wheels and running gear, but the truck was parked at an angle on the edge of the highway with the body extending out into the road some three or four feet above the ground, and some four feet beyond the rear wheels. It was the duty of the plaintiff when meeting the approaching cars to dim his lights. When he dimmed the lights the beam was necessarily thrown down on the highway, causing it to shine under the rear end of the truck, which was protruding some distance over the road. Under these circumstances, we do not think the plaintiff was negligent in failing to see the truck sooner than he did.

"For the reasons set out above, our answer to the first question is that we cannot lay down a hard and fast rule to govern in these types of cases because so much depends upon the circumstances of each particular case.

"Our answer to question two is that under the facts outlined the plaintiff was not guilty of contributory negligence."

As the answers given by the Supreme Court to the questions propounded by us and which were based on the facts as we found them, settle the question of liability we are now left with the sole but difficult task of assessing damages against the defendants.

The total demand made by the plaintiff is for the sum of $31,463.02, itemized as follows:

| | |
|---|---:|
| Loss of salary and earnings to date of probable recovery..... | $ 1200.00 |
| Hospital and sanitarium bill.... | 446.02 |
| Medical and dental treatments.. | 649.00 |
| Nurses ...................... | 468.00 |
| Estimated cost of drugs........ | 100.00 |
| Damage to clothing; loss of spectacles, etc. .............. | 100.00 |
| Total ................... | $ 3963.02 |
| Physical injuries .............. | $ 7500.00 |
| Permanent disabilities ......... | 7500.00 |
| Permanent disfigurement ...... | 5000.00 |
| Pain and suffering............. | 5000.00 |
| Mental anguish and distress.... | 2500.00 |
| Total ................... | $31463.02 |

There was an intervention filed by the United States Fidelity & Guaranty Company and Rapides Grocery Company, the latter being the plaintiff's employer and the former its compensation insurance carrier. They pray for judgment in the sum of $1,020 for amounts of compensation previously paid the plaintiff and for such additional sums as may have to be paid prior to the final judgment that is to be rendered herein or until such time as plaintiff should recover entirely from his injuries. They pray for an additional award in the sum of $250 for medical and hospital fees which the Compensation Law of this State obligates the employer to pay to the injured employee, and for the further sum of $300 as fees for their attorney employed in connection with their intervention.

Interventions were also filed by each, Miss Ora Mouch and Mrs. Henry F. Gasquet, registered nurses, who each claim thirty-nine days nursing at $6 per day, making a total of $234 for each. They each also ask for reasonable attorneys' fees for filing their respective interventions which they allege should be not less than $50 in each case.

The district judge who had found for the plaintiff and decreed liability against both defendants, made the following awards:

| | |
|---|---:|
| Hospital and Sanitarium ....... $ | 446.02 |
| Medical and dental treatment... | 649.00 |
| Amount due nurses............ | 468.00 |
| Clothing ..................... | 22.00 |
| Spectacles ................... | 21.00 |
| | $ 1606.02 |
| Physical injuries, permanent disabilities and disfigurement.... | $10500.00 |
| Pain and suffering, mental anguish and distress.......... | 5500.00 |
| Total ................... | $17606.02 |

The judgment is rendered in solido against both defendants to the extent of $10,043 and the defendant Co-Operative Produce Company is cast with the balance of $7,563.02.

The United States Fidelity and Guaranty Company and Rapides Grocery Company are awarded the sum of $1,660 on their intervention for compensation paid plaintiff from October 4, 1937, to May 10, 1939, and such additional sums as they may have to pay to him subsequent to May 10, 1939. They are also awarded the sum of $250 for medical expenses and the further sum of $300 as attorneys' fees.

The interventions of Miss Mouch and Mrs. Gasquet were dismissed as in case of non-suit. The amount demanded by each is included in the total sum awarded to the plaintiff on his demand for nursing expenses. As there is no law under which they were entitled to recover attorney's fees, the dismissal of the intervention in each instance as in case of non-suit, carried with it the dismissal of that demand.

The Fidelity and Guaranty Fire Corporation had filed a separate suit against the defendants for damage caused by the loss of plaintiff's automobile which it had insured. The claim was for $337 which it was admitted during the trial of the case represented the correct amount of the loss. By agreement of counsel it was stipulated that if judgment in this suit went in favor of the plaintiff judgment would likewise follow in favor of the plaintiff in that suit. We note that the judgment in the present case decrees the amount in favor of the plaintiff in this suit which apparently was done through inadvertence as the stipulation itself provides that a separate decree shall be entered in each case.

Plaintiff has filed an answer to the appeal in which he seeks an amendment to the judgment and prays that the amount of the award be increased to the amount of the original demand presented by him. The defendants on the other hand contend that the amount of the award is excessive and should be greatly reduced.

There is no doubt but that the plaintiff in this case sustained most severe and painful injuries and went through a most horrifying ordeal, and is entitled to very substantial damages. Immediately following the accident he was taken to Our Lady of the Lake Sanitarium in Baton Rouge and Dr. W. H. Cook was called to see him. We think his condition is best described by the following excerpts from the testimony of that doctor: "When I saw him he was sitting up, that is they were holding him up. He had, I found on examination, a fractured skull, a fractured nose, a fracture of both the upper and lower jaws, and three ribs were fractured. He also had a fractured right arm. He was suffering a good deal from shock and was bloody all over * * *. So far as the condition of shock was con-

cerned, his pulse was weak, he was cold and clammy. He was not exactly irrational, but he was very much confused * * *." The doctor then describes in a somewhat gruesome manner how he felt the bones at the different fractures described by him rubbing against each other and with reference to the fracture of his jaws how difficult it was for him to breathe because of the blood he was blowing out of his mouth. He gave him all the attention he could that night and gave him sedatives for the pain he was suffering. The following day he had X-rays made in order to verify his diagnosis with regard to the various fractures. "Because it was impossible to give him any general anesthetics I had to put traction on the fractured arm and pull it in as good position as was possible under the circumstances. I called in Dr. Ashton Toups, a dentist to look at plaintiff's face and jaws and find out what he thought would be best for immediate treatment, as well as for the future." A few days later Dr. R. B. Benton, another dentist was called in also. After a time, as he got a little better in his general condition, the doctors attempted to wire his jaws on six or seven occasions and after that proved more or less unsatisfactory as to results it was suggested that he consult a dental surgeon in New Orleans which he did.

Dr. Cook states that in his opinion, plaintiff "suffered about as much pain as a person could be called on to suffer". The operations which involved the wiring of his jaws for the purpose of tieing the upper and lower jaws together was particularly a painful ordeal, made the more so because it had to be done under local anesthetics.

Dr. Toups and Dr. Benton both describe these operations in detail and relate the difficulties they experienced in making any progress and how finally it became necessary for them to refer plaintiff to a specialist in New Orleans. The specialist who saw him is Dr. Leopold L. Levy who was first consulted on September 22, 1938. He describes the condition he found and what he did to try to correct it but seems to be doubtful as to the ultimate results. If they are unsatisfactory, he says, the only recourse would be to a major operation involving bone grafting which is out of his field of work.

Dr. Lionel F. Lorio treated plaintiff for the fracture of the nose which he reset by manipulating the broken bones. That was all that could be done at the time, but he states that there is a serious injury to the septum which will require operative treatment in order to be corrected.

With regard to the condition of plaintiff's arm Dr. Cook says that he feels that under the circumstances the results have been good. He says that he has a fair use of his arm, though it is by no means perfect. He can raise the shoulder up to about three-fourths of the normal function.

At the time of the accident plaintiff was forty-eight years old, married and had seven children whose ages ranged from 9 to 26 years. He was employed by the Rapides Grocery Company as a whiskey salesman and for three years prior to his injury his earnings never averaged less than $175 a month. He estimated them at about $225. He says that he cannot begin to do the amount of work he did before the accident. He suffers continuous pain in his jaw and has great difficulty in eating, even now being obliged to live on liquids and semihard foods. He cannot lift his arm high for if he does he feels a severe pain like if someone was twisting it. He doesn't feel any more pain from the fractured ribs and the only effects remaining from the fracture of the skull he describes as a tight feeling, a sensation something alike to a person's hand going to sleep. He details the expenses incurred by him and on examination we find that they are in the amounts as awarded in the judgment of the trial court.

We have gone somewhat into detail in describing plaintiff's injuries and the results for the reason that we have been unable to find any case that is similar in almost any respect. In fact, we find no case which would serve as a guide in making an award. Plaintiff is fortunate enough in having recovered to the extent as found by Dr. Cook and whilst there may be some impairment to the full function of his arm it is hardly probable that it should greatly handicap him in doing the kind of work he was accustomed to do before the accident. His biggest element of damage arises from the fracture of his jaws and the pain and inconvenience he is put to by reason thereof; and also the disfigurement which no doubt causes him embarrassment. As we have said he is, in our opinion, entitled to substantial dam-

ages but we have concluded that the amount allowed him by the trial court is excessive and it will accordingly be reduced.

The amount of actual expenses allowed by the district judge, as already pointed out, is what was proven. These are in the sum of $1,606.02. For the physical injuries suffered by plaintiff and for the disabilities resulting therefrom as well as for disfigurement, we will award the sum of $9,000. For the pain and suffering endured by him, we will allow $3,500. The total amount of the award therefore is the sum of $14,106.02, or $3,500 less than the total award made in the judgment appealed from. As the judgment correctly disposed of the various interventions, the decree with respect to these will not be disturbed. The judgment also properly limited the amount of the award as against the defendant, Massachusetts Bonding and Insurance Company, to the extent of its liability. That part of the judgment which contains a decree in favor of the plaintiff, Fidelity and Guaranty Fire Corporation against the defendants, for the damages occasioned by the loss of plaintiff's car is incorrect and will have to be eliminated.

For the foregoing reasons, it is now ordered, adjudged and decreed that the judgment appealed from be and the same is hereby amended by reducing the amount of the total award from the sum of $17,606.02 to the sum of $14,106.02, and by eliminating that part of the decree in favor of the Fidelity and Guaranty Fire Corporation against the defendants, and that as thus amended it be affirmed.