## Haynes' Admrs. v. Cincinnati, New Orleans & Texas Pacific Railroad Company, et al.

(Decided November 2, 1911.)

### Appeal from Pulaski Circuit Court.

1. **Master and Servant—Liability of Servant to Third Persons.**—We do not recognize any distinction so far as the accountability of the servant is concerned between the acts of misfeasance and nonfeasance. If a servant performs in an unlawful manner an act that results in injury to a third person, or if a servant fails to observe a duty that he owes to third persons, and injury results from his fault of commission or omission, he is liable in damages. Responsibility attaches to him as an individual wrong-doer, without respect to the position in which he acts or the relation he

bears to some other person. It is the fact that the servant is guilty of a wrongful or negligent act amounting to a breach of duty that he owes to the injured person that makes him liable.

2. Same—Servant Not Liable for Defects in Machinery Furnished by the Master.—A servant is not responsible to third person for defects in machinery or implements that he is merely employed to work with under the direction of the master. If the things furnished by the master are defective or unsafe, the liability for the injury attaches to him and not to the servant. Therefore, a railroad engineer is not personally liable in an action for damages brought by a fireman who was injured by a defect in an engine furnished by the master.

3. Removal of Actions—Motion to Transfer, When May be Made.—When it appears during the trial, or at the conclusion of the evidence for the plaintiff in an action against a resident and non-resident defendant that there is a failure of proof against the resident defendant, the non-resident defendant may when this condition arises renew a motion to transfer on the ground of fraudulent joinder previously and in due time made.

4. Same—Fraudulent Joinder—Test of.—The fact that the trial court direct a verdict in favor of a resident defendant does not conclusively determine the right of the non-resident defendant to removal. This court will consider the whole record, and if upon an inspection we should be of the opinion that the trial court erred in determining that no case was made out against the resident defendant, we will hold it was error to transfer the case. We would also hold that the order of removal was improper, if it appeared from the record that when the petition was filed the plaintiff had evidence reasonably sufficient to make out a case against the resident defendant, although he might for any reason be unable to produce it at the trial.

5. Fraudulent Joinder—Good Faith, Question of Fact.—The good faith of the plaintiff in joining a resident defendant is a question of fact to be determined by the record and not by the words the pleader may use in stating his cause of action. It will be presumed, until the contrary appears, that the plaintiff in good faith believed he had a cause of action against the resident defendant, but this presumption must give way when it is conclusively shown on the trial that no case has been or could at any stage of the proceedings have been made out against the resident defendant.

H. C. FAULKNER & SONS, SHARP, BETHURUM & COOPER for appellants.

O. H. WADDLE & SON for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This action was brought to recover damages for the death of E. L. Haynes, a fireman on appellee's railway,

and who was killed in the State of Tennessee. The company, and William Hudson, the engineer in charge of the engine on which appellant was a fireman, were made defendants. The negligence upon which the action was grounded is stated in the petition as follows: that while Haynes was employed as a fireman—

"And in the line of his employment and duties as such, the boiler and engine exploded, and threw great quantities of hot steam, water and other matter upon his body, scalding and burning him so badly that he soon thereafter died from the effects thereof; and the said explosion of the boiler and engine resulted from and was immediately caused by serious and dangerous defects on and in the same, and that but for which defective and dangerous condition of the boiler and engine, and its attachments, the same would not have exploded, or the intestate received the injuries stated. They state that the dangerous and defective condition of the boiler and engine and its attachments were well known to the defendants, the Cincinnati, New Orleans & Texas Pacific Railway Company, and William Hudson, the engineer in charge of the engine and superior to Haynes in point of service, or could have been known to them by the exercise of ordinary care in time to have prevented the explosion; and that the dangerous and defective condition of the engine and boiler and attachments was unknown to the deceased, and could not by the exercise of ordinary care have been known to him in time to have prevented the injuries and death aforesaid. They state that the accident above set forth and described, and the death of their intestate, H. L. Haynes, was caused by the gross carelessness and negligence and wrongful acts of the defendants, and that their said negligence and carelessness was joint and concurrent."

In an amended petition the law of Tennessee setting out the circumstances under which damages may be recovered in actions like this was pleaded, and it was subsequently agreed—

"That under the laws of the State of Tennessee and in force at the time of the infliction of the injuries of plaintiffs' intestate referred to and complained of in the petition, and still in force, an engineman and fireman in charge of and operating a locomotive engine of a railroad company or corporation operating a railroad in said State, and while such engine is being operated therein, such engineman and fireman are fellow servants, and the

railroad company or corporation so owning and operating said railway engine and railroad and in whose service the engineman and fireman are at the time engaged is not liable for any injury or death inflicted upon either said engineman or fireman by reason of any negligent or wrongful act upon the part of the other; and that if plaintiffs' intestate received the injuries complained of as a result of the negligent management and operation of the engine by the engineer, the defendant railway company is not liable therefor."

In due time and in proper form the railway company, a foreign corporation, filed its petition, accompanied by bond, and moved the court to transfer the case to the federal court, upon the ground stated in the removal petition that the joinder of the resident engineer was fraudulent and for the purpose of depriving the non-resident defendant of its right to have the action removed. This motion was overruled, and afterwards the defendants filed separate answers, traversing the averments of the petition and pleading contributory negligence. The railway company also pleaded that as under the laws of Tennessee the engineer and fireman were fellow servants, it was not liable if the injury to the fireman was caused by the negligence of the engineer.

Upon the conclusion of the evidence for plaintiff the court on motion of the engineer instructed the jury to find a verdict in his favor. Immediately upon this motion being sustained, counsel for the railway company again offered to file the petition and bond for the removal that had been theretofore filed and made a part of the record, and moved the court to enter an order removing the case to the Circuit Court of the United States for the Eastern District of Kentucky, and this motion over the objection of counsel for the plaintiffs was sustained.

This appeal is prosecuted from the order of the court directing the jury to find a verdict in favor of Hudson, the engineer, and from the order removing the action against the railway company to the United States Circuit Court.

The accident happened in this way—the engine on which Haynes was firing was the second engine in a double-header freight train going south from Somerset. The train left Somerset at 9:30 in the morning, and a little after twelve o'clock that night, and while the train was running, the crown-sheet blew out and the escaping steam and water scalded the fireman so badly that he

died soon afterwards. The crown-sheet is a large sheet of iron that covers the fire box of the engine, the top of it being covered with hot or boiling water. In other words, on the lower side of the crown-sheet is the fire, and on top of the crown-sheet is the water. The blowing out of the crown-sheet, as it is called, may be caused by not having enough water in the boiler, or by having too much steam. If there is not enough water in the boiler, the fire will burn the crown-sheet, and thus let the water and steam on top of it down in the fire box; and if there is too much steam, it will crack or break the crown-sheet, producing the same effect. At the moment of the accident, the fireman opened the fire box door, and just as he opened it the crown-sheet burst and the hot steam and water poured out of the door. The engineer testified that he was informed that the crown-sheet of this engine had been burned and injured some two or three months before this trip, and that it was a rule of the company that engineers should go to the board and see the engine that was marked for them to take out, and then go and get the engine ready, but that he did not remember whether the fact that he had heard that the crown-sheet had been burned before that was in his mind or not. That, as directed by the orders, he got the engine ready and started out with it. He said that he could not see the steam gauge on his side of the engine, as while he was on the trip, one of the window panes fell out of the cab window on his side and the wind blowing in prevented him from having any light that would enable him to see the steam gauge on his side, and that just a moment before the accident he went to the fireman's side to get a drink of water, and as he came back to his side he looked at the steam gauge on the fireman's side, and observing that it registered 220 pounds, said to the fireman, "You are carrying too much steam in the boiler." Thereupon, the fireman opened the fire box door and the explosion occurred. That there were two safety valves on the engine, both of them adjusted at 180 pounds, and both were blowing off when he told the fireman he was carrying too much steam. That, while under the rules the engineer was in charge of the engine, yet it was the duty of the fireman to keep steam up, and the duty of both of them to see that a sufficient quantity of water was in the boiler and not too much steam. That neither the fireman nor the engineer had anything to do with the arrangement of the safety valves. That even with a properly equipped

steam gauge adjusted to let off steam at 180 pounds, the steam may go higher if the fire is kept up. That the boiler was full of water. That in a good many engines there was a soft metal plug in the crown-sheet, put there so that if the crown-sheet got too hot this plug would melt out and thereby prevent an explosion, but that modern engines were built without these plugs. He said that the engine was fired up when delivered to him, but that it was his duty to inspect the crown-sheet and that he did so before starting. It is further shown by the engineer that the company's rules required the boilers of the engines to be washed out every twelve days, but that he did not know whether this boiler had been washed regularly or not. He said that he made a careful examination of the engine before starting from Somerset, and found everything in good condition, that there were no defects in the engine that he knew of, and that they had no trouble until the explosion of the crown-sheet occurred.

The road foreman of engines, whose duty it was to inspect engines, was introduced as a witness for the plaintiff and testified in substance that a month or so before this accident the crown-sheet on this engine had been burned, but that it was repaired and in good condition when it went out on this trip.

Neil Silvers, who had formerly been an engineer on this road, was introduced as a witness and said that if the crown-sheet of this engine had been burned out and repaired, it would not be as substantial as it was before.

In short, the evidence showed this state of facts: That the company directs the engineer what engine to take out, and it is the duty of the engineer to inspect the engine and see that it is equipped with all the necessary implements and machinery and in good condition. That Hudson, the engineer, did this before starting out with this engine, and so far as he knew or could tell the engine was in good condition when he left Somerset with it. That there were two steam gauges on this engine, one on the engineer's side and one on the fireman's side, and it was the duty of both engineer and fireman to notice these steam gauges and see that the proper amount of steam was kept up, and a sufficient quantity of water kept in the boiler. That sometime after leaving Somerset a pane in the cab window blew out, or was shaken out, leaving the space open, and the wind coming in this opening prevented the lamp at the steam gauge from being lighted on the engineer's side. That the fireman knew of this condi-

tion, and was warned by the engineer to keep his eye on the steam gauge on his side. That there was plenty of water in the boiler at the time the accident occurred, and two steam gauges adjusted to blow off steam at 180 pounds were popping off steam. That immediately before the accident the engineer walked across to the fireman's side of the engine to get a drink of water, and discovered that the steam gauge on the fireman's side showed that the engine was carrying 220 pounds of steam, whereupon he told the fireman that the engine had too much steam, and walked back to his side of the cab. That just as he reached his side of the cab, the fireman opened the firebox door—for what purpose the evidence does not disclose but presumably to allow the engine to cool off—and when he opened the fire box door the explosion occurred, due to the "burning out" as it is called, of the crown-sheet. That this accident could have been caused by not enough water or too much steam; but, as uncontradicted evidence is that the boiler was full of water, the explosion must have been due to the excessive amount of steam the engine was carrying. It is further shown that the engine, with the exception of the window pane falling out, was in good working order during the whole trip, until the explosion occurred. Under this state of facts, we think it plain that the court properly instructed the jury to return a verdict for the engineer. There is absolutely no evidence of any negligence on the part of the engineer. If it was his duty to inspect the engine before he took it out for the purpose of ascertaining whether or not it was in good condition, he testifies without contradiction that he did this. If it was his duty to see that an excessive quantity of steam was not carried, this duty was also enjoined on the fireman; and, as the fireman could see the steam gauge on his side, and the engineer could not see the one on his side, it is clear that as between the engineer and fireman the engineer was not negligent in this respect. If the accident was due to negligence at all, a question we do not express any opinion concerning, it was the negligence of the company in sending out the engine with a defective crown-sheet, although the weight of the evidence tends to show that the accident was caused by the excessive steam in the boiler and not by any defect in the crown-sheet. The record does not present, as insisted by counsel, any question of misfeasance or nonfeasance on the part of the engineer. "Misfeasance is the performance of an act which might

lawfully be done in an improper manner, by which another person receives an injury,'' while ''nonfeasance is the non-performance of some act which ought to be performed.''—Bouvier's Law Dictionary. If the accident had been caused by either misfeasance or non-feasance amounting to a breach of duty on the part of the engineer, we would hold him liable. In some jurisdictions the servant is not held accountable to third persons for non-feasance, but is for misfeasance; but a contrary rule and one that is in accord with the weight of modern authority prevails in this State. We do not recognize any distinction so far as the accountability of the servant is concerned between acts of misfeasance and non-feasance. Ward v. Pullman Co., 131 Ky., 142, 25 L. R. A., n. s. 343; C. &. O. Ry. Co. v. Banks, 144 Ky. 137; Illinois Central R. R. Co. v. Coley, 121 Ky. 385, 1 L. R. A., n. s. 370. If a servant performs in an unlawful manner an act that results in injury to a third person, or if a servant fails to observe a duty that he owes to third persons, and injury results from his fault of commission or omission, he is liable in damages. There is no reason for making a distinction between acts of commission and omission when each involves a breach of duty. The servant is not personally liable in either case because the breach of duty was committed by him while acting in the capacity of servant, but responsibility attaches to him as an individual wrong-doer without respect to the position in which he acts or the relation he bears to some other person. It is the fact that the servant is guilty of a wrongful or negligent act amounting to a breach of duty that he owes to the injured person that makes him liable. It is not at all material whether his wrongful or negligent act is committed in an affirmative or wilful manner, or results from mere non-attention to a duty that he owes to third persons, and that it is entirely within his power to perform or omit to perform. There are innumerable situations and conditions presented in the every day affairs of life that make it the duty of persons to so act as not to harm others, and when any person, whatever his position or relation in life may be, fails from negligence, inattention or wilfulness to perform the duty imposed, he will be liable. Ellis v. Southern Railway Co., 2 L. R. A., n. s. 378. For illustration, if it was the exclusive duty of the engineer under the circumstances shown by the record to observe and control the amount of steam carried, or the

condition of the water in the boiler, and the fireman had no duty to perform in respect to these matters, except as he might be directed by the engineer, we would say that the engineer was liable in this action, and this without reference to whether the breach of duty committed by him in this respect was one of misfeasance or non-feasance. But when it is sought to hold the servant liable because he works with defective or unsafe machinery or implements furnished to him by the master and injury results due to the defects an entirely different question is presented. It is neither the province nor the duty of the servant to dictate to the master the character of tools, implements or machinery that he shall be provided with. The servant has usually no right of selection or voice in the kind or quality of machinery or implements he must work with. These things are furnished by the master and if they are defective or unsafe the liability attaches to the master and not to the servant. It would be a most unreasonable doctrine to hold a person responsible for defects in machinery that he was merely employed to work with under the direction of a superior who possessed the exclusive right to furnish the tools or machinery needed by him in the performance of his duties. To hold the servant answerable for the delinquency or wrong-doing of the master would be to put upon him responsibilities that he did not assume in accepting the employment and charge him with conduct that the conditions of employment placed it beyond his power to control. We therefore think it is clear that when as in this case a railroad company furnishes an engine to an engineer and directs him to take it out, that the engineer is not personally liable in an action for damages because injuries are occasioned by some defect in the engine. Being of the opinion that the trial court properly directed a verdict in favor of the engineer, the next question is—was it error to sustain the motion of counsel for the railway company to transfer the case to the federal court?

Whatever may be the rule in other jurisdictions, it is well established in this that when it appears during the trial of a case against a resident and non-resident defendant that there is a failure of proof against the resident defendant, the non-resident defendant may when this condition arises renew a motion to transfer on the ground of fraudulent joinder previously and in due time made. Dudley v. Illinois Central R. Co., 127 Ky.; 221; 13 L. R. A.,

n. s., 1186; Illinois Central R. Co. v. Coley, 121 Ky., 385, 1 L. R. A., n. s., 370; C. &. O. Ry. Co. v. Banks, 144 Ky., 137; Underwood v. Illinois Central R. Co., 31 Ky. Law Rep., 595; Ward v. Pullman Co., 131 Ky., 142, 25 L. R. A., n. s., 343. We did not hold in these cases, nor do we now lay it down as a rule of practice, that the decision of the trial court that the plaintiff has failed to make out a case against the resident defendant conclusively determines the right of the non-resident defendant to removal. The ruling of the trial court upon the question of removal is subject to review by this court, and if upon an inspection of the record we should be of the opinion that the trial court erred in determining that no case was made out against the resident defendant, we would hold that it was error to transfer the case. We would also hold that the order for removal was improper, if it appeared from the record that when the petition was filed the plaintiff had evidence reasonably sufficient to make out a case against the resident defendant, although he might for any reason be unable to produce it at the trial. But, when, as in the case before us, we are satisfied from a consideration of the whole record that the plaintiff totally failed to make out a case against the resident defendant, and there is no showing that when the action was filed he could have made out a better one, it follows from the ruling in the cases before mentioned that we must agree with the trial court that the non-resident defendant was entitled to remove the action. The practice we have adopted in this particular is vigorously assailed by counsel for appellant, as it has been by counsel in other cases presenting the same question. The argument is again pressed, as it has often been before, that the right of removal is to be determined by the averments of the petition filed by the plaintiff, and that nothing that may subsequently arise in the case can deprive the State court of jurisdiction if the petition states a good joint cause of action against the resident and non-resident defendants. In other words, the insistence is that although it may appear during the trial that the plaintiff has utterly failed to make out a case against the resident defendant, and it does not appear that when the petition was filed he had reason to believe he could make out a case that notwithstanding these admitted facts, if the petition states a good joint and several cause of action the court is precluded from any further inquiry into the matter. In support of this view, our attention is called to some cases decided by the

United States Supreme Court, and by the federal courts, which it is claimed sustain the contention of counsel and are in conflict with the rule of practice we have adopted. It is scarcely necessary to observe that if it were true that the United States Supreme Court had so held, we would not hesitate to retract what we have said upon this point, first, because we have no disposition to deprive our State courts of jurisdiction to which they are entitled, and second, because in questions like this, the Supreme Court is the final authority, and we would feel bound by its decisions. But we do not think the cases cited by counsel announce a different rule on the point under consideration from that held by this court. In Whitcomb v. Smithson, 175 U. S., 635, 44 L. Ed., 313, an action was brought in a State court against a resident railroad company and the receivers of another railroad company who were appointed by the circuit court of the United States. In due time the receivers filed a petition for removal on the ground of adverse citizenship, setting up that the resident railway company was fraudulently made a party for the sole purpose of preventing a removal of the cause. An order of removal was entered by the State court, and the cause sent to the Circuit Court of the United States, and thereafter that court remanded it to the State court. After the testimony was in, the court instructed the jury to return a verdict for the resident railroad company, and thereupon the receivers renewed their motion for removal which was overruled. The case then proceeded to trial against the receivers, and judgment was rendered, which was afterwards affirmed by the Supreme Court of Minnesota. A writ of error was taken from that court to the Supreme Court of the United States, and in the course of the opinion that court said the ruling of the trial court—

"Was a ruling on the merits and not a ruling on the question of jurisdiction. It was adverse to plaintiff, and without his assent, and the trial court rightly held that it did not operate to make the case then removable, and thereby to enable the other defendants to prevent plaintiff from taking a verdict against them. The right to remove was not contingent on the aspect the case may have assumed on the facts developed on the merits of the issues tried. As we have said, the contention that the railway company was fraudulently joined as a defendant had been disposed of by the circuit court. But, assuming, without deciding,

that that contention could have been properly renewed, under the circumstances it is sufficient to say that the record before us does not sustain it.''

In Kansas City Suburban Ry. Co. v. Hermon, 187 U. S., 63, 47 L. Ed., 63, the suit was against a resident and non-resident defendant. A motion to remove was made by the non-resident upon grounds that did not involve the question of fraudulent joinder. The motion being denied, the non-resident defendant filed a transcript of the record in the Circuit Court of the United States, in which court a motion to remand was sustained. Afterwards, upon the trial in the State court a verdict was directed by the trial court in favor of the resident defendant, and thereupon the non-resident defendant offered a second petition for removal, charging a fraudulent joinder. When this petition was filed, the plaintiff without objection filed an affidavit denying that the joinder was fraudulent, and averring that when the petition was filed he believed in good faith he had and in fact did have a joint cause of action against both the defendant's, but that on account of the inability to obtain witnesses he was unable to present the state of facts he had in his possession when the petition was filed. The application for removal was overruled, and judgment being rendered against the non-resident, it appealed. In holding that the trial court properly refused to remove the case, the court said:

''The first petition in terms raised no issue of fraudulent joinder, but the second petition did. Was that issue seasonably raised, and if so, ought the case to have been removed? The second petition did not state when petitioner was first informed of the alleged fraud, but left it to inference that it was not until after the plaintiff had introduced his evidence, notwithstanding the averments in the first petition. But, apart from this, the averments of fraud were specifically denied, and so far as the record discloses the petitioner who had the affirmative of the issue failed to make out his case. * * * Nor was the evidence introduced on plaintiff's behalf and demurred to made part of the record, and the bare fact that the trial court held it insufficient to justify a verdict against the terminal company was not conclusive of bad faith. The trial court may have erred in its ruling, or there may have been evidence which though insufficient to sustain a verdict would have shown the plaintiff had reasonable ground for a bona fide belief in the liability of both defendants. In these circumstances the case comes within

Smithson v. Whitcomb, and the judgment must be affirmed.''

In Weckler v. National Enameling Co.; 204 U. S., 176, 51 L. Ed., 430, Weckler brought an action in the State court against the National Enameling Company, a nonresident corporation, and Schenck and Wettengel, individuals and residents of the State in which the action was brought.   In due time, the corporation filed its removal petition, charging a fraudulent joinder of the resident defendants.   An order of removal was made, and the motion to remand overruled; thereupon the plaintiff prosecuted an appeal from the United States Circuit Court to the Supreme Court of the United States.   No evidence was heard in the Circuit Court but affidavits were filed in support of the averments of the removal petition, and also controverting affidavits by the plaintiff.   Upon these affidavits the Circuit Court reached the conclusion that considered with the complaint they showed conclusively an attempt to defeat the jurisdiction of the federal court. In affirming the judgment of the Circuit Court, the Supreme Court said:

''While the plaintiff in good faith may proceed in the State courts upon a cause of action which he alleges to be joint, it is equally true that the federal court should not sanction devices intended to prevent a removal to federal courts where one has that right, and should be equally as vigilant to protect the right to proceed in the federal court as to permit the State courts in proper cases to retain their own jurisdiction.''

These cases, especially the Weckler case decided subsequently to the Whitcomb case, we think sustain our practice, and it is clear that the Whitcomb case is not in conflict with it; nor have we been furnished with any authority that is.   It will be conceded that if the joinder was fraudulent, and not in good faith, the case should be transferred; but counsel insists that the question of whether or not the joinder is fraudulent is to be determined alone by the averments of the petition.   To this we do not agree.   The attorney who files a petition may believe in good faith that he has a joint cause of action, and be entirely free from any purpose to practice a fraud, and yet as a matter of law he might be altogether wrong in his opinion.   Whether the joinder is legally fraudulent or in good faith, is to be determined by the facts appearing in the record and not solely by the averments of the petition.   The pleader is presumed to know when he files

his petition whether or not he can make out a case against the resident defendant; and if at the time he files his petition he has evidence or witnesses who will sustain his complaint against the resident defendant, the fact that circumstances may deprive him of this evidence on the trial will not justify removal, but when the situation at the time of the trial is precisely the same as it was when the petition was filed and when the plaintiff is in possession of and introduces all the evidence that he had when the petition was filed, and totally fails to make out a case against the resident defendant, it can not in fairness be said that the petition in good faith stated a cause of action against the resident defendant. Good faith, when put in issue, is a question of fact to be determined by the record and not by the words the pleader may use in stating his cause of action. While it will be presumed until the contrary appears that the plaintiff in good faith believed he had a cause of action against the resident defendant, this presumption must give way when it is conclusively shown on the trial that no case has been or could at any stage of the proceedings have been made out against the resident defendant. It is manifest that any other rule would enable the plaintiff to defeat in every case like this the act of Congress allowing a removal to a non-resident defendant by merely joining a resident defendant and stating a good joint cause of action against each defendant. We can not give our approval to a practice like this.

Wherefore, the judgment is affirmed.