68 So.2d 337 (1953)
WASHINGTON
v.
T. SMITH & SON, Inc. et al.
No. 19657.
Court of Appeal of Louisiana, Orleans.
May 25, 1953.
Writ of Certiorari Denied November 9, 1953.
On Rehearing December 15, 1953.
*339 Wagner & Jarreau, New Orleans, for Thaddeus Washington, plaintiff and appellant.
Deutsch, Kerrigan & Stiles and Breard, Snellings, New Orleans, for T. Smith & Son, Inc., and Employers' Liability Assur. Corp., Ltd., defendants and appellees.
Rosen, Kammer, Hopkins, Burke & Lapeyre, New Orleans, for E. S. Binnings and American Mut. Liability Ins. Co., defendants and appellees.
Dufour, St. Paul & Levy, New Orleans, for General Accident Fire & Life Assur. Corp., Ltd., intervenor and appellant.
McBRIDE, Judge.
This is an action sounding in tort. Fifty crates or boxes of aircraft parts contained in three railroad cars, consigned to the French Government, care of Farrell Shipping Co., Inc., arrived at the First Street Wharf of the public docks in New Orleans, and on the instructions of Farrell Shipping Co., Inc., who are freight forwarding agents, T. Smith & Son, Inc., engaged in the stevedoring business, unloaded the cars and delivered the shipment to E. S. Binnings, steamship agent, for transshipment by the French Line, which was then owned or controlled by the French Government. The shipment included two large crates similar in size and shape, containing aircraft wings, which were too high to allow their passage from the inner apron of the wharf through the door into the closed portion of the wharf.
Talazac, foreman for Smith, when it was found that the two crates were too high for the door, went to Latino, who was Binnings' employee, whose duty it was to receive freight and spot cargo on the wharf, and told him of the situation and asked him if it would be satisfactory to place the crates on the inner apron outside of the closed portion of the wharf. Latino said "it would be all right with me if they could fix them." The first of the large crates was removed from the car and was placed on the apron of the wharf adjacent to the railroad track and was positioned so as to lean against the outside of the galvanized iron wall enclosing Section 36 of the wharf. Smith's employees then unloaded the second crate from the railroad car, the one involved in the accident hereinafter discussed, and placed it against the wall in a similar fashion. This crate, weighing 3300 pounds, measured 18 feet 9 inches long by 8 feet 6 inches wide on one end, and about 1 foot 10 inches thick on that end, by 12 feet 5 inches wide on the other end, and being 3 feet thick on this latter end, was rested on its long side with about a 2-foot lean against the wall. One end of the crate protruded from 18 to 24 inches into the open doorway of Section 35 *340 of the wharf. After the shipment had been unloaded and placed on the wharf, the two large crates having been placed as above related, one of Binnings' employees receipted therefor in the name of Binnings as agent for the French Line. All of this took place on December 4, 1947, and the second of the large crates remained where it had been placed without untoward incident until December 15, 1947, eleven days thereafter.
Five employees of T. Smith & Son, Inc., appearing as witnesses in its behalf, and two of Binnings' employees, testifying for him, all stated that the crates had been properly placed and chocked and were made safe and secure in the usual and customary way. Pitre, one of Smith's witnesses, testified that the crates had been placed in the usual fashion, adding that "I seen it done a hundred times the same way."
At any rate, on December 15, 1947, possibly in the morning, the record not being clear on this point, the large crate, the second one which had been unloaded and tilted against the wall of the shed, fell upon Thaddeus Washington, an employee of Hogsett Company, Inc., who was a member of a "gang" engaged in unloading cars at the First Street Wharf. At the time of the occurrence Washington was pushing a hand-truck along the inner apron and was passing in front of the crated airplane wing. The evidence is clear that the crate did not slide from the bottom or rest end but toppled over and fell in an outward direction from the shed wall.
Washington, who suffered severe physical injuries, brought this suit against T. Smith & Son, Inc. and its liability insurer, The Employers' Liability Assurance Corporation, Ltd., and E. S. Binnings and his liability insurer, American Mutual Liability Insurance Company, solidarily, for $38,249.00 damages. General Accident Fire & Life Assurance Corp., Ltd. intervened claiming the amount of workmen's compensation which it paid to Washington as an employee of its insured, Hogsett Company, Inc., and certain medical expenditures, in consequence of the injuries which Washington sustained as a result of the fall of the crate.
E. S. Binnings was never cited in connection with the demand of Washington, nor did he file any pleadings or make appearance as one of Washington's defendants. However, Binnings was served with citation on the petition of intervention of the General Accident Fire & Life Insurance Corp., Ltd., and, therefore, his role is only that of a defendant in the intervention.
To the petition of plaintiff, American Mutual Liability Insurance Company interposed exceptions of no right or cause of action as to it, and the American Mutual Liability Insurance Company and E. S. Binnings filed exceptions of no right or cause of action to the petition of intervention of the General Accident Fire & Life Assurance Corporation, Ltd. The exceptions were referred to the merits of the case by the trial judge, and thereafter American Mutual Liability Insurance Company made answer to the petition of Washington, and both Binnings and American Mutual Liability Insurance Company filed their answer to the petition of intervention of the General Accident Fire & Life Assurance Corporation, Ltd. After hearing the case on its merits, the trial judge, without written reasons and without making reference to the exceptions, rendered a judgment in favor of T. Smith & Son, Inc., The Employers' Liability Assurance Corporation, Ltd., and American Mutual Liability Insurance Company, dismissing the demands of the plaintiff at his cost. The judgment also dismissed the intervention of General Accident Fire & Life Assurance Corporation, Ltd. The plaintiff and the intervenor both have appealed.
By way of answer to the appeals, the American Mutual Liability Insurance Company reserved all of its rights under its exceptions of no right or cause of action and re-urged them, and Binnings, by way of answer to the appeal of General Accident Fire & Life Assurance Corporation, Ltd., reserved all of his rights under and *341 re-urged the exceptions of no right or cause of action leveled at the intervention.
Plaintiff first relies on the doctrine of res ipsa loquitur. The petition alleges that he is not able to point out the exact manner in which the accident occurred and that the cause of the accident is properly within the knowledge of T. Smith & Son, Inc. and Binnings.
Alternatively, Washington alleges that the accident resulted from specific acts of negligence ascribed to T. Smith & Son, Inc. and E. S. Binnings. The former is charged with negligently having placed the crate on unstable and uneven dunnage and at a point where part of the crate extended over a door opening intended for the passage of freight and ventilation, which rendered the crate susceptible to being tipped and to fall. Binnings in charged with negligence in failing to discover the precarious position of the crate and by not resetting and properly supporting it.
The answers of the respective respondents deny negligence and responsibility for Washington's injuries.
We shall first discuss the question of liability of T. Smith & Son, Inc., as its employees had charge of placing, and did place, the crate on the apron of the wharf. This defendant and its liability insurer filed in this court on the day the case was argued an exception of no right or cause of action to plaintiff's petition, but this exception need not be considered in view of the conclusion we have reached on the merits of the case.
Washington's testimony is that when he was in the act of passing the crate with his hand-truck he heard someone call "look out," and before he could turn to look the crate fell upon him. He cannot be held to have been bound to anticipate that the crate would fall; nor can it reasonably be said that he should have noticed what might have caused it to do so. The accident under investigation ordinarily would not have occurred without some act of omission or commission either on the part of T. Smith & Son, Inc. or E. S. Binnings, and the fact that the crate fell in the manner in which it did is sufficient to create a presumption of negligence. Therefore, plaintiff has the right to invoke the doctrine of res ipsa loquitur and to call upon those responsible for the particular position of the crate on the apron of the wharf, if they are to be exculpated, to show absence of negligence on their part. The reasons for the doctrine are discussed in the leading case in this State on the subject, Lykiardopoulo v. New Orleans & C. R., Light & Power Co., 127 La. 309, 53 So. 575. The doctrine of res ipsa loquitur has found applicability in various types of cases involving falling articles, e. g., a portion of hatch cover falling down the hold of a ship, Taylor v. United Fruit Co., 126 La. 568, 52 So. 770; wood falling from a "dolly," Patrick v. T. Smith & Sons, Inc., La.App., 56 So.2d 190; the fall of pipes stacked on a sidewalk, DeCuers v. Crane Co., La.App., 40 So.2d 61; where some wheels fell, Mercer v. Tremont & G. Ry. Co., La.App., 19 So.2d 270; a bale of paper falling from a dray, Pizzitola v. Letellier Transfer Co., La.App., 167 So. 158.
But a question is whether res ipsa loquitur should be applied insofar as defendant, T. Smith & Son, Inc., is concerned. The crate did not fall until eleven days had elapsed after being placed on the wharf by the employees of that defendant. Any connection T. Smith & Son, Inc. had with the crate terminated on December 4, 1947, the day the shipment was unloaded from the railroad cars and placed on the wharf. The evidence clearly shows that at all times thereafter many employees for different concerns worked in the vicinity of the crate with hand-trucks and bars unloading heavy machinery, and numbers of trucks and automobiles passed continuously through the wharf, and that the wharf teemed with people constantly moving about upon the apron. In fact on the very day the crate fell upon plaintiff there was in operation, about 35 feet removed from where the crate had been standing, a crane having a 35-foot boom unloading 40-foot logs. It was testified to that this *342 crane was used to lift the crate off of Washington. There is a strong possibility that the activities on the wharf during the intervening eleven days may have had something to do with changing the position of the crate or jarring and weakening the chocks and dunnage, thus making its mode of standing and position insecure. In view of that possibility our conclusion is that the doctrine of res ipsa loquitur should not be applied as to the defendant, T. Smith & Son, Inc., in the absence of proof by the plaintiff that there was no intervening occurrence between the time of the placing of the crate on the apron and the happening of the accident, which might itself have been the cause of the crate falling. DeCuers v. Crane, Co., supra.
And as to the specific acts of negligence alternatively charged to T. Smith & Son, Inc., suffice it to say that the evidence falls far short of making proof thereof. Therefore, plaintiff having failed to carry the burden of proof in that regard, T. Smith & Son, Inc. and its liability insurer must be dismissed from the case.
Binnings himself testified that when the shipment was delivered upon the wharf by T. Smith & Son, Inc., it then came into his custody with "approximately the same responsibilities" as warehousemen. There is not the least doubt that at the moment the offending crate came into Binnings' custody and he took control, it was braced securely, resting against the shed. This fact is not only demonstrated by the testimony of many witnesses who said that the crate had been tilted and chocked in the customary and accepted manner, but was more forcibly brought out by Acquistapace, chief clerk for Binnings, who said that about five o'clock in the afternoon of the day the crate had been unloaded and set on the side of the wharf, he went out and examined it to satisfy himself if it was secure enough "to hold up, and it was." Acquistapace tested it "to see if it was loose and it wasn't." It, therefore, becomes quite obvious that whatever may have caused the crate to topple over arose at some point of time subsequent to its delivery by T. Smith & Son, Inc. to Binnings, and under the doctrine of res ipsa loquitur, it became Binnings' duty and obligation toshow his freedom from negligence if he is to be absolved from fault.
No explanation has been attempted by Binnings as to why the crate fell, other than a vague explanation that an Act of God must have intervened and caused the accident. Binnings places reliance on the testimony of two witnesses, who said that in their opinions a gust of wind dislodged the crate. The testimony of one of these, Frank by name, runs as follows:
"Yes, I saw it fall over on him. I was the only one standing behind from where he had passed. I saw it coming over but I didn't realize it was falling over until I took a second look. Then I seen it coming too far over to be still standing straight. That is when I hollered `Look out!'
"Q. You think the wind blew it over? A. That is what I think."
St. Amant, who was the only other witness who actually saw the crate as it fell, made no mention whatsoever of the wind having played a part in the occurrence.
Acquistapace, who was in Binnings' office about 300 feet away from the scene, was asked on his examination what he thought caused the crate to fall, and his answer was: "My opinion was because of the gust of wind at the time." Later in his testimony this witness said: "That is the only thing I can see."
It is significant to note that neither Frank nor Acquistapace stated it as a fact that the velocity of the wind was responsible for the accident. The only reasonable construction which can be placed on their evidence is that they believed that the wind caused the crate to topple and fall upon Washington. There was filed in the record a certificate of the United States Weather Bureau setting forth the recordings of the wind velocities on the day in question, but the data therein can serve no useful purpose, because there is nothing which gives *343 us any idea as to what time on December 15, 1947 the accident happened. We cannot believe that the ordinary December wind could have caused the crate, which admittedly weighed 3300 pounds, to crash down upon the apron of the wharf if its position and supports had remained the same as when the crate had been delivered to Binnings by T. Smith & Son, Inc. eleven days earlier. There is no suggestion from any source that the velocity of the wind at any time of the day in question reached unusual proportions or was sufficient to cause the incident of the crate falling over. Nothing short of a storm could possibly have upset the crate according to Acquistapace:
"* * * I figured it was solid enough to stay up there for anything but a storm, unless somebody hit it with a heavy truck or something, * * *."
It is clear that Washington, a Negro laborer, injured while engaged in the duties of his occupation with another employer, could have no knowledge as to what caused the falling of the large crate, and under the law he had the right to call upon the person who had custody of and was in charge of it to explain the accident, and if he would avoid liability, to prove that he was without fault. Binnings has failed to meet the exactions of the law since no explanation, even remotely plausible, has been advanced. We have no information whatsoever as to what may have caused the accident and the consequent injuries sustained by the plaintiff. A finding of negligence on the part of Binnings is in order.
Counsel for Binnings and his insurer contend that if Binnings, who had the crate in his charge merely as the agent of the French Line, failed to discover the precarious position of it, and consequently did nothing to render its position a safe one, he then can only be said to be guilty of an act of nonfeasance for which an agent is not responsible in tort to a third person. This theory is the predicate upon which rest the exceptions of no cause or right of action, which have been strenously reurged before us.
First, let us say that an act of nonfeasance has not been shown as being the only thing that could have caused the accident. We repeat that we have no knowledge as to what may have been the cause, and the crate might well have fallen as a result of some affirmative act amounting to a misfeasance on the part of Binnings' servants about which plaintiff has no knowledge, for which the law would hold him to accountability. It is true that plaintiff did allege that Binnings was the agent of the French Government, and that he was guilty of negligence in failing to discover the unstable position of the crate, but it must be borne in mind that that allegation was made in the alternative and only after the doctrine of res ipsa loquitur, upon which plaintiff relies, was first specially pleaded. If the specific charge of negligence had not been made, plaintiff would have been entitled to a recovery and we do not see how the presence of the alternative plea detracts from or in any way weakens plaintiff's position. The two pleas amount to this, and this only: If the court should find that the doctrine of res ipsa loquitur is inapplicable, then plaintiff's case is to stand or fall on the allegation that Binnings was negligent in failing to discover and remedy the precarious situation of the crate. Such a position is countenanced by law and does not even afford sufficient ground to force a plaintiff to elect which of the two pleas he desires to rely upon. See Nicol v. Jacoby, 157 La. 757, 103 So. 33.
But aside from that, and undertaking a discussion on the assumption that Binnings was guilty only of nonfeasance, nevertheless, plaintiff has the right to recover for his damages.
As applied in the cases of agency, nonfeasance has been many times defined to be the total omission or failure of the agent to enter upon the performance of some distinct duty or undertaking owed to his principal. Misfeasance means the improper *344 doing of an act which the agent might lawfully do. Here in Louisiana, as well as in some other jurisdictions, an agent is not ordinarily liable to third persons for his nonfeasance. Our Supreme Court many years ago said: "* * * an agent is personally responsible to third parties for doing something which he ought not to have done, but not for not doing something which he ought to have done, the agent, in the latter case, being liable to his principal only. * * * No man increases or diminishes his obligations to strangers by becoming an agent."
The above-quoted language was extracted from Delaney v. Rochereau & Co., 34 La. Ann. 1123, decided in the year 1882. The plaintiffs sued for the death of their minor son, who was killed as the result of going upon the gallery of a vacant house which gave way. The suit was directed against the agents of the owner, who resided in France, it being alleged that they, as agents of the owner, were bound to keep the house in good order but "without justification neglected to do so." The Court considered the case with reference to the English, Roman, and French law, and in dismissing the suit also said:
"The theory on which the suit rests is, that agents are liable to third parties injured, for their non-feasance.
"* * * For non-feasance, or mere neglect in the performance of duty, the responsibility therefor must arise from some express or implied obligation between particular parties standing in privity of law or contract with each other. No man is bound to answer for such violation of duty or obligation except to those to whom he has become directly bound or amenable for his conduct.
"Every one, whether he is principal or agent, is responsible directly to persons injured by his own negligence, in fulfilling obligations resting upon him in his individual character and which the law imposes upon him, independent of contract. No man increases or diminishes his obligations to strangers by becoming an agent. If, in the course of his agency, he comes in contact with the person or property of a stranger, he is liable for any injury he may do to either, by his negligence, in respect to duties imposed by law upon him in common with all other men.
"An agent is not responsible to third persons for any negligence in the performance of duties devolving upon him purely from his agency, since he cannot, as agent, be subject to any obligations towards third persons other than those of his principal. Those duties are not imposed upon him by law. He has agreed with no one, except his principal, to perform them. In failing to do so, he wrongs no one but his principal, who alone can hold him responsible. * * *
"It is an error to suppose that the principle of the civil law, on the liability of agents to third persons, is different from those of the common law. It is certainly not broader."
The above case has been cited time and time again in various types of agency cases, but the arguments centered around nonfeasance and misfeasance are generally found in that field where an agent is in control of tangible property, and owing to his failure to repair, the property becomes dangerous to third persons.
We have not been cited to any case, nor does our painstaking research reveal any, wherein an appellate court in any jurisdiction has had before it for determination a matter in which facts anywise similar to those existing here prevail.
In some jurisdictions the agent is not accountable to third persons for nonfeasance, but is for misfeasance. However, the weight of modern authority is that no distinction is recognized, as far as the accountability of the agent is concerned, between acts of misfeasance and nonfeasance. See Haynes' Adm'rs v. Cincinnati, N. O. & T. P. R. Co., 145 Ky. 209, 140 S.W. 176, 180, wherein the court said:

*345 "It is not at all material whether his wrongful or negligent act is committed in an affirmative or willful manner, or results from mere nonattention to a duty that he owes to third persons, and that it is entirely within his power to perform or omit to perform. There are innumerable situations and conditions presented in the everyday affairs of life that make it the duty of persons to so act as not to harm others, and when any person, whatever his position or relation in life may be, fails, from negligence, inattention, or willfulness, to perform the duty imposed he will be liable. Ellis v. Southern Railway Co., 72 S.C. 465, 52 S.E. 228, 2 L. R.A.,N.S., 378. * * *"
Some courts have held that an omission on the part of an agent might amount to a misfeasance. E. N. Emery & Co. v. American Refrigerator Transit Co., 194 Iowa 926, 189 N.W. 824; Ryan v. Standard Oil Co. of Indiana, Mo.App., 144 S.W.2d 170; Lambert v. Jones, 339 Mo. 677, 98 S.W.2d 752; Franklin v. May Department Stores Co., D. C., 25 F.Supp. 735.
A note set forth in Ward v. Pullman Co., 131 Ky. 142, 114 S.W. 754, 25 L.R.A.,N.S., 345 recites:
"It is very interesting to note that, among the decisions passing upon the question since the preparation of the earlier note, not a case which adopts the view that the word `misfeasance' as used in connection with this rule may include acts of omission as well as commission has held the servant not liable for the omission alleged; so that, while many cases do state that a servant is not liable for his nonfeasance, such statements are but little more than dicta, for the particular negligence in question, though an omission, was held to be a misfeasance, and not a nonfeasance. The courts reach what is apparently a sound conclusion, notwithstanding the attempt to sustain a distinction which is very intangible, to say the least."
In commenting upon Delaney v. Rochereau, supra, Mechem, in his "Outlines of the Law of Agency" (1952), page 235, observes:
"§ 348.The view stated * * * has not become obsolete. It is still true that one is not liable to another to whom he owes no duty. There has, however, been a gradual expansion of the duty concept as a matter of tort law. Modern cases tend to hold that one who takes control of a piece of property or a situation thereby comes under an obligation to use reasonable care to see that the property or situation does not become harmful to third parties. As put in Baird v. Shipman the agent is under a `common-law obligation to so use that which he controls as not to injure another.' Thus in a leading case it was held that a railroad section foreman, whose duties included keeping the right of way free of inflammable materials, was liable to a third party whose property was destroyed by fire in consequence of a foreman's failure to do his duty."
Prof. Seavey, late of the Tulane Law School, at the conclusion of his interesting article "Liability of an Agent in Tort" (1916), So. L. Q., Vol. 1, states:
"* * * A large part of the world's work is to-day carried on by means of various agencies. More and more we rely upon the performance of those who are employees. Our lives, property and enjoyment are in their hands. The principals are often in distant places. In many cases if there is no relief against the agent, there is none at all; in any event the remedy through the principal is a circumlocution. Going with the extension of the rule of respondeat superior, based on the power to control, should be a recognition of the fullest personal and direct responsibility of the agent, the one in actual control. The statement that `no man increaseshis obligations to strangers by becoming an agent' is not *346 good in law, sound in justice, nor satisfying in its economic effects."
Everyone is under the obligation, whether his role be that of an agent or owner, of not allowing things subject to his control to injure another, either because of active or passive negligence, and whenever property in one's control becomes dangerous to third persons, there is the duty to act affirmatively. It matters not whether active or passive negligence causes the ultimate result. As commented in the abovequoted article, does it differ, in testing the tort liability of an engineer at the throttle and in control of a boiler, whether he ties down the safety valve or fails to untie it; whether he "affirmatively" injures the boiler or continues to use a defective one? And, would it not be absurd to hold that a servant placed at the open door of a tiger's cage, whose duty it is to close the door when there is any indication that the tiger will escape, and who goes to sleep, is not liable to a member of the public injured through the escape of the tiger, because he was guilty only of "nonfeasance"?
Binnings' duty to see to it that the property in his custody, as agent of the owner, did not cause injury to a third person, was independent of and unconnected with any obligations or duty which were owed by him to his principal. The duty as to the one is imposed by law, and to the other the duty flowed from the contract of agency. An injured third party's right to recover for the agent's negligence cannot be said to depend upon any contractual liability to the principal. By not attending the crate, and in failing to see that it was properly and securely braced against the wall, if this can be said to have been the cause of the accident, Binnings is nonetheless exposed to liability for plaintiff's injuries and consequent damages.
The doctrine enunciated by the Supreme Court in Delaney v. Rochereau, supra, should not be applied to the case in which we are now interested. We are not dealing with a neglectful managing agent of real estate, but with the custodian of a chattel, which, although harmless in itself, had the potential of becoming, if improperly handled, as dangerous as a dynamite bomb.
The provisions of Art. 2317, LSAC.C., cannot be overlooked. This article provides in part:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. * * *"
The article means by things in one's custody such things over which that person maintains supervision and control. The whole basis of tort liability, so far as physical injuries are concerned, at least lies in control. We cannot absolve Binnings merely because he was someone's agent.
The exceptions are not well founded.
Washington sustained crushing injuries, and was taken to the Charity Hospital in New Orleans on the day of the accident. Later on that same day, December 15, 1947, he was conveyed to the Flint-Goodridge Hospital and was placed in charge of Dr. Dan D. Baker by the insurance carrier of Washington's employer. When Dr. Baker first saw plaintiff at the Flint-Goodridge Hospital his right arm and forearm were then in a long cast, which remained in place for a period of about six weeks thereafter. The patient's side was strapped with adhesive tape for about five weeks, and he wasfinally discharged from the hospital on December 24. Thereafter plaintiff visited Dr. Baker's office about twice a week until August 12, 1948 when he was finally discharged as being able to return to his customary employment.
Five or six of Washington's ribs had been fractured, and there was also a comminuted fracture of the right humerus, a fracture near the sternal extremity of the left clavicle, and his right lung was pierced and torn by the bone fragments from the fractured ribs. X-rays made in April or May 1948, during the time when Washington was making the semi-weekly *347 visits to Dr. Baker's office, showed that all fracture sites had healed in a satisfactory manner. Dr. Baker, upon discharging Washington, found atrophy in the arm and forearm because of disuse. The testimony also shows that as a result of the injuries to Washington's lung he spat blood.
In August 1948, after his discharge, plaintiff, who contended that he could not return to his job, lodged a claim for additional compensation from his employer. When this claim was made, the compensation insurer sent him to Dr. James L. LeNoir, orthopedic surgeon, who made a complete examination of the patient. At that time Washington complained of spitting blood and loss of feeling in the upper extremities with inability to move his shoulder and elbow on the right. After examining Washington, Dr. LeNoir concluded his report with the following observation:
"* * * I would also advise a medical consultation concerning the hemoptysis, for there is a possibility that this man has a tubercular pulmonary lesion. In view of the bizarre sensory phenomena in the upper extremity, and in view of the limitation of shoulder and elbow motion on the right, I believe it unwise to offer now a disability evaluation, and would recommend a further time interval before this evaluation is made."
Dr. LeNoir believed that a further effort should be made at mobilization of the elbow and right shoulder. It is interesting to note that although this medical expert examined Washington at the instance of the workmen's compensation insurer for plaintiff's employer, he appeared as a witness for the plaintiff.
The plaintiff was examined by three other physicians. Dr. Howard H. Karr, a practitioner of neurosurgery, saw plaintiff on November 15, 1948, and after making his examination, concluded that the patient was physically qualified for the performance of the work he was formerly engaged in, and did not require further treatment, and that he had received the maximum benefits of hospitalization and treatment. Dr. Karr's examination was made from the standpoint of ascertaining whether there had been any injury to the nervous system.
On January 25, 1950 plaintiff was examined by Dr. George D. Berkett, orthopedic specialist, whose conclusion was that the plaintiff's injuries had been completely corrected and that he was practically 100% functionally able to carry on his work. Dr. Berkett found that the plaintiff's claim of disability because of chest pains was not substantiated by his examination or by Xray plates.
On the following day, January 26, 1950, Dr. Samuel Nadler, who specializes in internal medicine, saw the plaintiff and made his examination, and his opinion was that the cardiovascular system, which is the heart and lungs structure, was normal, and that so far as he could ascertain the plaintiff from that standpoint was fully able to perform his work as a freight handler.
Dr. Blaise Salatich, who testified for the plaintiff, and on whose testimony plaintiff relies in his claim for permanent disability, made his examination on March 10, 1950. Dr. Salatich formulated the opinion that the patient is unable to carry on any physical activity which would impose and require exercise of the shoulder girdle, neck, head, or anterior chest walls. He believed that Washington, due to a marked degree of fixation in the thoracic cage, was unable to take on any physical activities which would result in any amount of deep breathing following such activity. This expert concluded that there was resulting residual disability which he considered to be of a permanent nature.
It is not disputed by any of the experts that all the fractures of Washington's bones have healed, but the dispute comes about from Dr. Salatich's opinion that the bones did not heal in a correct anatomical position. It is the contention of plaintiff that there is a permanent deformity of the left sternoclavicular joint, permanent fixation of the thoracic cage, soft tissue contracture of the right elbow and right shoulder with *348 limitation of motion, loss of sensory perception in the right hand, and loss of grasping power in the right hand.
Therefore, in deciding the question of damages, it is necessary for us to accept either the testimony of Dr. Salatich or of the defense experts. Dr. LeNoir's testimony should not be given serious consideration because at the time of his examination on August 27, 1948 he suspected that Washington had a tubercular pulmonary lesion, which, in other words, means traumatic consumption. It is conceded, even by plaintiff's counsel that Washington does not now, nor did he ever, suffer from that complaint.
We are inclined to believe that Dr. Baker, who treated Washington from the very day on which he had been injured up to August 12, 1948, a period of eight months, would be in a better position to evaluate his condition. The other medical experts who testified made their examinations after Dr. Baker had released the plaintiff as being fully cured and able to return to his employment. We agree that the injuries plaintiff suffered were of a serious nature and cannot be considered as otherwise. But, Washington claims that the accident rendered him physically incapable of returning to the duties of his employment, and the burden rested upon him to show that such a deteriorated physical condition exists, of which we are not at all convinced.
There is a circumstance in the record which should be mentioned here. The trial was held beginning on March 15, 1950, or more than two years after the date of the accident. Yet the plaintiff at that time had heavily-calloused hands as appears from the dictation of the trial judge of that fact into the record after his examination of these extremities of plaintiff. Dr. Berkett stated that the callouses would indicate to his mind that Washington had worked since the accident. The fact of the existence of the callouses somewhat militates against the claim that the injuries left plaintiff in such a physical condition as would inhibit his doing laboring work.
We have concluded that an award of $5000 for Washington's injuries and pain and suffering would do substantial justice. There is no standard or gauge by which damages for physical injuries can be computed, and after carefully considering the matter, we believe that such an award to plaintiff would amply compensate him. However, plaintiff could not work for a period of eight months. At the time of the accident he was earning from $40 to $45 each week, the average weekly earnings therefore being $42.50. Therefore, Washington lost in wages the sum of $1445, and he is entitled to a recovery for that. The medical expenses incurred in his treatment amounted to $482.39, for which he should also be reimbursed.
Now, as to the intervention of the workmen's compensation insurer of Hogsett Co., Inc. The intervenor is clearly entitled to have and recover for the total amount of workmen's compensation paid to plaintiff, plus medical expenses, as the result of the injuries which were caused by a third person, Acts 1914, No. 20, § 7(1,2), as amended (now LSA-R.S. 23:1101).
The intervenor paid compensation at the rate of $20 per week for a period of thirtyfour weeks, totaling $680, and in addition expended $482.39 for medical expenses, which amounts aggregate $1162.39.
Accordingly, the judgment appealed from, insofar as it dismisses plaintiff's suit as against American Mutual Liability Insurance Company, and insofar as it dismisses the intervention of General Accident Fire & Life Assurance Corp., Ltd., as against E. S. Binnings and American Mutual Liability Insurance Company, be and the same is hereby avoided and reversed, and it is now ordered that the judgment be amended as follows: (1) so as to dismiss the exceptions of no right or cause of action; (2) so as to provide that the plaintiff, Thaddeus Washington, have judgment against American Mutual Liability Insurance Company for the full sum of $6927.39, with legal interest from judicial demand until paid, and all costs of this suit; and (3) so as *349 to provide that out of the said judgment in favor of plaintiff that the intervenor, General Accident Fire & Life Assurance Corp., Ltd., shall be paid by preference and priority the sum of $1162.39; and as thus amended and in all other respects the judgment be and it is hereby affirmed.
Costs of this court are to be borne by American Mutual Liability Insurance Company.
Reversed in part amended and affirmed in part.
On Rehearing
REGAN, Judge.
We granted a rehearing in this matter and limited our consideration thereof to whether the intervenor, General Accident Fire & Life Assurance Corporation, the employer's liability insurer, to whom we had awarded a judgment of $1162.39, representing compensation and medical expenses paid to plaintiff, the employee, was entitled to a reasonable attorney's fee.
The workmen's compensation insurance carrier is legally subrogated to all rights and actions to which the employer is entitled. LSA-Revised Statutes of 1950, Title 23, Section 1162 provides in part as follows:
"The insurer shall be subrogated to all rights and actions which the employer is entitled to under this Chapter."
The statutory authority upon which intervenor bases its claim for a reasonable attorney's fee is Title 23, Section 1103 of the LSA-Revised Statutes of 1950, which reads in part as follows:-
"In the event that the employer or the employee or his dependent becomes party plaintiff in a suit against a third person as provided in R.S. 23:1102, and damages are recovered, such damages shall be so apportioned in the judgment that the claim of the employer for the compensation actually paid shall take precedence over that of the injured employee or his dependent; and if the damages are not sufficient or are sufficient only to reimburse the employer for the compensation which he has actually paid, with a reasonable attorney's fee and his costs, such damages shall be assessed solely in his favor; * * *."
In view of the context of the foregoing act we entertain no doubt that the intervenor is entitled to recover a reasonable attorney's fee.
In the relatively recent case of Alford v. Louisiana & Arkansas Ry. Co., 1949, 38 So. 2d 258 the Court of Appeal (Second Circuit) awarded an attorney's fee to the intervening employer in conformity with the provisions of Act 20 of 1914, Section 7 (now LSA-R.S. 23:1103). See, also, Gaiennie v. Co-Operative Produce Co., La. App.1941, 199 So. 610.
An examination of the record discloses that the trial in the district court consumed approximately five days and, on appeal, the matter was argued before us.
Proof of the value of the services rendered need not be offered in evidence, but the court can, on its own initiative, fix a reasonable attorney's fee since these services were literally performed in the presence of and under the eyes of the Court.
It is our opinion that intervenor should recover, as a reasonable attorney's fee, the sum of $250. In evaluating the legal services the focal point of our consideration was the nature of the case.
For the reasons assigned our original opinion and decree is amended so as to allow the intervenor, General Accident Fire & Life Assurance Corporation, Ltd., to recover the additional sum of $250 as an attorney's fee and, as thus amended, it is reinstated and made the final judgment of this court.
Original decree amended and reinstated.